### SOUTHERN COTTON OIL CO. v. CENTRAL OF GEORGIA RY. CO.

(District Court, E. D. Georgia, S. D. April 22, 1913.)

ACTION (§ 6*)—MOOT QUESTIONS.

Since the Interstate Commerce Commission is primarily charged with the duty of passing on the validity of a contract between a railroad company and a corporation operating a wharf, for transferring freight from cars to vessels, the federal courts would not take jurisdiction of a friendly suit by the corporation against the railroad company to recover compensation under its contract, which involved no actual controversy and was brought merely to obtain a judgment which might be pleaded in defense of a disapproval of the railway company's allowance by the Commission.

[Ed. Note.—For other cases, see Action, Cent. Dig. § 40; Dec. Dig. § 6.*]

At Law. Action by the Southern Cotton Oil Company against the Central of Georgia Railway Company. Dismissed.

Geo. W. Owens, of Savannah, Ga., for plaintiff.
Lawton & Cunningham, of Savannah, Ga., for defendant.

SPEER, District Judge. The petition before the court recites that the Central of Georgia Railway Company is indebted to the South-

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

ern Cotton Oil Company in the amount of $844.16, besides interest from the 12th day of June, 1909. This indebtedness is declared upon the facts following:

On the 10th of April, 1909, the defendant company published its tariff as follows:

"G. F. O. Special No. 18–A.           I. C. C. No. 1522.
   Cancels G. F. O. Special 18.         Cancels I. C. C. No. 1491."

From this change in the tariff it is claimed that:

"Five (5) cents per ton of 2,000 pounds will be paid to the Southern Cotton Oil Company out of the published rate for wharfage and handling at Savannah, Ga., on cotton seed oil cake delivered to vessels berthed at Central of Georgia Railway wharves."

·This payment was made for the cost of labor in handling the product from the cars to the shipside, and for grinding and sacking the cotton seed oil cake at the grinding plant of the Southern Cotton Oil Company, located at Savannah, on the Central of Georgia Railway terminals. This tariff became effective on May 15, 1909. This appears by the statement of C. T. Airey, freight traffic manager of the defendant company, at Savannah, Ga.

Petitioner declares that by virtue of this tariff it is entitled to be paid by the defendant 5 cents per ton on 24,405 tons, delivered to 18 steamships, the names of which are set forth. The sum thus earned is $1,220.25, and of this the defendant has paid $376.09, leaving $844.16, besides interest from the 12th day of June, 1909, due and unpaid. This balance petitioner declares defendant fails and refuses to pay. To this petition defendant has apparently filed no formal answer. On the hearing, however, the indebtedness sued for was admitted; but defendant declined to pay it, unless expressly authorized so to do by the judgment of the court. This refusal on the part of defendant is ascribed to the fear that it may be adjudged in contempt of the views of the Interstate Commerce Commission governing such payments.

The duty which the defendant has thus imposed upon the court is somewhat unusual. The Interstate Commerce Commission is not a party to the proceedings, and, if it were, no other court would proceed with greater reluctance in contravening the rulings and orders which have done so much to give the people concerned in interstate commerce inestimable protection and equality of opportunity, for which, before the Commission was created, the most sanguine could scarcely hope.

It is true that the Supreme Court, in the case of Interstate Commerce Commission v. Diffenbaugh, 222 U. S. 42, 32 Sup. Ct. 22, 56 L. Ed. 83, holds that the interstate commerce act does not attempt to equalize fortunes, opportunities, and abilities. While this, then, is not the purpose of the law, it is, nevertheless, its effect. In that case it appears that, in order to facilitate business and make quick return of cars, it became necessary for the Union Pacific Company to pass shipments of grain through elevators at Omaha and Kansas City. While passing through the elevator the grain was also weighed. If

the Union Pacific could not use these instrumentalities to expedite the grain traffic, it could not compete with other roads which have through lines across the grain country. With these necessities in mind, the railway company made a contract with one Peavey, by which he built an elevator at Council Bluffs, on the other side of the river from Omaha. He was to receive not exceeding 1¼ cents per 100 pounds for the first 10 years and 1 cent for the next 10 years for grain transferred through his elevator. No additional charge was made to the shipper for the elevator service. It appeared, further, that in 1904 the Interstate Commerce Commission investigated this matter and upheld the contract, including the allowance to Peavey & Co., not only for the grain of other shippers, but for their own grain. The matter having been brought to the attention of Congress by the Commission, that body by Act June 29, 1906, c. 3591, 34 Stat. 584 (U. S. Comp. St. Supp. 1911, p. 1285), provided that:

"The term 'transportation' shall include * * * all instrumentalities and facilities of shipment or carriage, irrespective of ownership or of any contract, express or implied, for the use thereof and all services in connection with the receipt, delivery, elevation, and transfer in transit, ventilation, refrigeration or icing, storage, and handling of property transported; and it shall be the duty of every carrier subject to the provisions of this act to provide and furnish such transportation upon reasonable request therefor, and to establish through routes," etc.

By section 6 the carrier was required to state separately in its schedules all terminal charges and all privileges or facilities granted or allowed, and by section 15 it was further provided:

"If the owner of the property transported under this act directly or indirectly renders any service connected with such transportation, or furnishes any instrumentality used therein, the charge and allowance therefor shall be no more than is just and reasonable, and the Commission may, after hearing on a complaint, determine what is a reasonable charge as the maximum to be paid by the carrier or carriers for the service so rendered or for the use of the instrumentality so furnished."

Upon this legislation the Supreme Court observes, through Mr. Justice Holmes, delivering the opinion:

"Congress clearly recognized that services such as those rendered by Peavey & Co. were services in transportation, and were to be paid for, notwithstanding the possibility that some advantage might be gained as a result."

It further appears from this opinion that upon further reflection the Interstate Commerce Commission had begun to change its views:

"In 1907, upon rehearing, it cut down the allowance of Peavey & Co. to three-quarters of a cent, estimating that to be the actual cost, and being of opinion that to allow any profit would be in effect to permit a rebate. 12 Interst Com. Com'n R. 85. The order made required the railroad company to desist from paying more than three-fourths of a cent per hundred pounds, for service rendered in the transfer or elevation of grain at Council Bluffs or Kansas City, to any one interested in the buying, selling or shipment of grain at those places, especially naming the appellees. This," said the learned justice, "is one of the orders complained of. The chief object of complaint, however, is an order made in the following year, on June 29, 1908. In that the Commission took the last step, and ordered the Union Pacific to desist from paying any allowance to Peavey & Co. on grain in which they have any interest that is not reshipped from their elevators within 10 days, or that

has been mixed, treated, weighed, or inspected in any of their elevators at the above-named points."

Discussing to some extent the reasons which led the Commission to this conclusion, a majority of the Supreme Court hold it erroneous.

"As the carrier is required," said the learned justice rendering the opinion, "to furnish this part of the transportation upon request, he could not be required to do it at his own expense, and there is nothing to prevent his hiring the instrumentality instead of owning it. In this case there is no complaint that the rate out of which the allowance is made is unreasonable, and it is admitted that three-quarters of a cent barely would pay the cost of the service rendered, without any reasonable profit to Peavey & Co. for the work."

In fine, the Supreme Court holds that the ruling of the Interstate Commerce Commission requiring the railroad company to desist from paying more than three-fourths of a cent per 100 pounds for the elevator service must stand, but its ruling prohibiting any allowance whatever to Peavey & Co. for the elevator service must be modified. This permitted to the elevator. allowances for grain reshipped within 10 days.

From our understanding of this decision it seems very clear that the propriety of such charges as those sued for here must depend upon the facts of each case. It is easy enough to see how a contract made with the Central of Georgia Railway Company with an elevator or other instrumentality for furnishing transportation and handling freight constructed by a favored company at its own terminals would not only have the effect of a rebate, but could drive all competitive shippers of similar freight out of business.

Here we are favored with no facts, except that the Central of Georgia Railway Company is willing to pay the charges, provided the court will grant some judgment which might be pleaded in defense, should the Interstate Commerce Commission disapprove these allowances by the Railway Company to the Cotton Oil Company. Here is no controversy, and the judicial power of the United States extends to controversies alone. While not necessarily collusive, this is obviously a friendly proceeding. If the particular question before the court has been submitted to the Interstate Commerce Commission, the record does not disclose it. That Commission, and not the court, is primarily charged with the duty of passing on questions of this character. To anticipate its ruling would seem at once superfluous and premature.

In view of these considerations, the court, ex mero motu, must decline to exercise jurisdiction.