# Wytheville.

## The Chesapeake and Ohio Railway Company
### v.
## Westinghouse, Church, Kerr & Company, Inc.
### and
## Walker D. Hines, Director General of Railroads, (Operating Chesapeake and Ohio Railroad),
### v.
## Westinghouse, Church, Kerr & Company, Inc.

June 12, 1924.

Absent, Burks, J.

1. FINDINGS OF COURT—*Conflict of Evidence—Weight of Findings.*—Where a jury is waived and all questions of law and fact are submitted to the judge of the trial court, and the evidence conflicts upon a material point, the judgment of the trial court on the facts will be given the same weight as if it were the verdict of a jury.

2. WORDS AND PHRASES—*Carriers—Rented and Assigned Engine.*—The distinction between a rented and an assigned engine is actual and fundamental. A rented engine presupposes turning over the exclusive control and use thereof for a pecuniary compensation, whereas, an "assigned engine" means the *allocation* to a particular shipper by the railroad of an engine for the performance of a railroad service. The railroad retains no control over the services of a rented engine. The use to which it is put is dependent upon the desires of the lessee. Control of the use of an "assigned engine" is always with the railroad, and no consideration passes for its use.

3. CONTRACTS—*Impossible Contracts—Carriers—Engine Employed in Expediting Delivery—Case at Bar.*—Where an engine, whether technically "assigned" defendant or not, was used in the performance of a transportation service in spotting cars consigned to defendant, for which service the carrier had already been fully paid in the line-haul rate, the service was manifestly one which the company was under obligation to perform, and from the performance of which it could only excuse itself by showing an impossibility of performance. And

that in the instant case there was no such impossibility of performance was shown by the testimony of one of defendant's witnesses, and was also apparent from the fact that defendant, by the use of one of the carrier's own engines and crew, accomplished what the carrier could have accomplished had it used the same means.

4. Contracts—*Void for Want of Consideration—Carriers—Assignment of Engine to Expedite Delivery—Case at Bar.*—Defendant was engaged in construction work for the government. Large quantities of material for use in such construction had arrived over the lines of plaintiff railroad at Newport News, consigned to defendant, where there was great congestion in the railway yards, and plaintiff railroad was clearly failing to deliver freight to consignees within a reasonable time. The freight was in carload lots, and defendant asked that an engine and crew be assigned it on the railroad's usual basis to expedite deliveries, billing defendant for cost of operation. Accordingly, plaintiffs agreed to assign an engine and crew and bill defendant for it with cost of supplies, etc., plus ten per cent.

*Held:* That the service performed by this engine was a service which plaintiffs should have rendered under the aggregate line-haul charge paid on the freight, and that the contract to pay plaintiffs was without legal consideration and void, and plaintiffs had no right to recover from defendant.

Error to a judgment of the Circuit Court of the city of Richmond, in an action of assumpsit. Judgment for defendant. Plaintiffs assign error.

*Affirmed.*

The opinion states the case.

*Leake, Leake & Spicer* and *Sherlock Bronson,* for the plaintiffs in error.

*Munford, Hunton, Williams & Anderson* and *Wirt P. Marks,* for the defendant in error.

Prentis, J., delivered the opinion of the court.

[1] These cases were heard together and upon the same testimony. They are actions of assumpsit for the use of an engine and expenses of its operation, the

road being under Federal control during part of the period involved. A jury was waived and all questions of law and fact were submitted to the judge of the trial court, so that where the evidence conflicts upon any material point, the judgment of the trial court on the facts will be given the same weight as if it were the verdict of a jury. *F. W. Stock & Sons* v. *Owen*, 129 Va. 261, 105 S. E. 587.

Ignoring the conflicts in the testimony which have been determined in favor of the defendant, the pertinent facts are these:

Westinghouse, Church, Kerr & Company, Inc., hereinafter called the contractors, entered into a contract with the United States Government for the construction of embarkation facilities at Newport News during the World War. Large quantities of material for use in such construction had arrived over the lines of the Chesapeake and Ohio Railway Company at Newport News, and there was great congestion there in the railway yard, because of this and of other activities there growing out of the war. This congestion is described by all of the witnesses as very great indeed and the railway company was clearly failing to deliver freight to the consignees within a reasonable time. The shipments here involved were in carloads, and these delayed cars were standing upon the tracks in the congested yard along with a great many cars for other consignees, so that the building operations were greatly impeded by these unreasonable delays in the delivery of such cars.

When the correspondence upon which these actions are based occurred, that condition is thus described: The contractor "experienced more and more difficulty in obtaining the necessary service on the tracks; in other

words, the Chesapeake and Ohio Railway would have cars in their yard for a week or ten days or two weeks before they would deliver to us on our siding, principally through the lack of, as they put it, train crews or engine facilities or some other thing, so that we had very many conferences with Mr. Ford (superintendent of terminals at Newport News and later general superintendent at Newport News) with a view of eliminating this condition, and he finally stated to me that the only possibility of their being able to make these deliveries of material to us in time to avoid delays in the construction work would be by assigning to us a locomotive. Meantime we had had about a thousand cars received up to that time and a large part of the cars were buried in the storage tracks in the Chesapeake and Ohio Railway yards, * * ."

Under these conditions, after personal interviews, these letters passed:

'Newport News, Va., September 28, 1917.

"Chesapeake and Ohio Railroad Co.,
    "Newport News, Va.
        "Attention Mr. Ford, Supt. of Terminal.
            1892-6

"Gentlemen:

"Referring to our conversation with you to-day, we believe the switching problem is getting so heavy on account of the work at the various sites that it would be advisable for you to assign us an engine and crew on your usual basis, billing us for cost of operation as you may elect.

"We would appreciate it if you would arrange for this engine and crew at the earliest possible moment, and

also advise us if there is anything we can do towards helping out in furnishing a crew for this engine.
"Yours very truly,
"Westinghouse, Church, Kerr & Company,
"Alfred W. Bowie, Engineer in Charge."

To which Mr. Ford replied September 29th, thus:

"Gentlemen:
"Your letter of the 28th inst. under file 1892–6, with respect to providing an engine and crew to take care of your business at the various camp sites.
"Beg to state that this engine will be assigned to your work, commencing Monday night, and you will be billed for the use of the engine and crew, together with the cost of supplies, repairs, etc., plus ten per cent."

Sidetracks for the delivery of carload shipments had keen constructed from the main line of the railroad company into the camps which were being constructed. The contractor employed A. G. Quarles, a man of twenty-eight years railroad experience, who had been in the employment of the railway company, and for seventeen years had acted as yard master at the Richmond yards; and put under him eight men, also their employees. At that time the conditions with the railway company at Newport News were such that apparently it was not only not able to deliver the cars, but was also unable to keep the records of the arrival and location of the cars for the various consignees. Under the direction of Quarles, these employees of the contractor were stationed in the yards and required to locate the cars consigned to the contractor, place tags or placards on them, indicating the siding upon which they were to be placed. The engine which, according to the claim of the railway company, was thus "rented" to the contractor, and

according to the claim of the contractor was thereby "assigned" to it, was used to deliver for unloading these cars, estimated altogether during the period involved to be 6,500 in number, upon the switches or delivery tracks of the contractor—that is, it was used, in railway vernacular, to "spot" the cars. The immediate direction of the operation of this engine was by Quarles, the employee of the contractor, subject to the general direction and supervision of the yard master of the railway company in charge of the Newport News yard, and at night, when Quarles was off duty, the engine assigned to this work "was operated under the immediate direction of the Chesapeake and Ohio yard master."

The plaintiffs seek to recover rental for the use of the engine specially assigned to this work, and the bills are made up of a per diem charge, cost of materials used in the operation of the engine, the wages of railway employees so engaged, with an additional charge of ten per cent for supervision, claimed, except as to the supervision charge, to be in accordance with a circular of the railroad company covering such rentals of equipment. There was no tariff filed either with the Interstate Commerce Commission or with the State Corporation Commission of Virginia, specifying such a rental charge, and the amounts which the plaintiffs seek to recover are independent of and in addition to rates for transportation service which are on file with each of the commissions.

The actions are defended on two grounds:

1. That the service performed by these engines was a service which the plaintiffs should have rendered under the aggregate line-haul charge paid on the freight, and that the supposed contract was without lawful consideration and void; and

2. That the contract violated the interstate com-

merce act and the laws of the State of Virginia in such case made and provided, and was, therefore, void and unenforceable.

To give proper consideration to these defenses, it is proper to consider the character of the service performed.

It is perfectly clear, under the tariffs on file, that the line-haul rates on these cars entitled the consignees to have them "spotted" or placed upon these private delivery sidings to be unloaded. As expressed by the witness Ford, the consignee was entitled to one placement of the car "on a track agreed upon by the railroad and the party owning the commodity, which would either have to be a general delivery, public delivery you might say, or a private industrial siding." That this expresses the true construction of the applicable rate which was published and filed is conceded.

Ignoring the fact that an inconsequential number of these cars, not exceeding twenty-five, were moved a second time because improperly spotted (for which additional movement the railway company is entitled to a switching charge in accordance with the published tariff), these cars were placed on the delivery tracks of the contractor, and the obligation to do this without additional charge was clearly upon the railway company.

One question at issue is said to be whether or not this engine was assigned or rented. The learned attorneys for the company make this frank and correct statement of this issue: "Were we to admit the correctness of the contention that this was a mere 'assignment' of an engine, without consideration, there would be no need to further contest the decision of the trial court, since these actions are based upon compensation for the use of the engine under the contract.

[2] "The distinction between a rented and an assigned engine is actual and fundamental. A rented engine presupposes turning over the exclusive control and use thereof for a pecuniary compensation, whereas, an 'assigned engine,' in the sense of the contention, means the *allocation* to a particular shipper by the railroad of an engine for the performance of a railroad service. The railroad retains no control over the services of a rented engine. The use to which it is put is dependent upon the desires of the lessee. Control of the use of an 'assigned engine' in the sense to which we have referred, is always with the railroad, and no consideration passes for its use."

While the language of the correspondence upon which the actions are based is not easily explicable, it does seem fair to assume that when Ford, the company's representative, in that correspondence states that the engine will be *assigned*, he thoroughly understood the sense in which the word "assigned" is generally used when referring to railway equipment; and that he did not have the rental contract circular in mind at the time he wrote that letter is suggested by the fact that he named ten per cent as the railway's compensation over and above the charge for use of the engine, wages of the engineman and crew, cost of supplies and repairs, whereas the rental circular provides: "All labor including service of crew, supplies and materials furnished, and tools or parts lost or broken, will be billed on basis of actual cost, plus twenty-five (25%) per cent."

[3] Whether this engine was technically assigned or not, it was used in the performance of a transportation service in spotting these cars, for which service the company has already been fully paid in the line-haul rate. This was a service which manifestly the com-

pany was under obligation to perform, and from the performance of which it can only excuse itself by showing an impossibility of performance. This use of the engine also aided in relieving the congestion and expedited deliveries not only to the contractor but also to other consignees at Newport News. That there was no such impossibility of performance is well shown by the testimony of one of the defendant's witnesses, and is also apparent. What the contractor, by the use of one of the company's own engines and crew, accomplished, the railway company itself could have accomplished if it had used the same means, and there is nothing to show any such impossibility. That it necessitated the employment of more labor and the exercise of greater diligence may be apparent, but that the company owed this diligence to the contractor as well as to all others whose shipments were delayed is equally apparent.

We do not think it necessary to consider or discuss the cases upon which the railway company relies, in which the services referred to, although within the definition of transportation services, were nevertheless special, and were not embraced within its duties as a common carrier. *Clough* v. *Grand Trunk Railway*, 155 Fed. 81, 85 C. C. A. 1, 11 L. R. A. (N. S.) 446, is typical of that line of cases. There a circus company, owning its own cars, contracted with the railroad company for the hire of motive power and the use of the tracks and trainmen to be considered as the circus company's servants, for the transportation of a train from one place to another; the contract exempting the railroad company from liability for injuries to any person or persons using the train, from whatever cause; and it was held that the railroad company being under no legal duty to move the circus company in the manner

specified, the contract was not contrary to public policy. There are many such cases, but in none of them was there any duty upon the carrier to perform the particular service involved. This is the fundamental difference between those cases and this. Here the service performed by the railway employees with the railway equipment was the precise service which the company was then under immediate obligation to perform with reasonable promptness under the circumstances and for which it has already been paid.

[4] We do not think it necessary to consider any other feature of the case, for there is nothing in the record which can vary or modify the result. There was no legal consideration for the promise relied on, and the trial court rightly determined that the railway company had no right to recover.

*Affirmed.*