# Richmond

## NORFOLK TIDEWATER TERMINALS, INC. v. NORFOLK & PORTSMOUTH BELT LINE RAILROAD COMPANY.

March 10, 1938.

Present, All the Justices.

The opinion states the case.

*James S. Barron,* for the plaintiff in error.

*Willcox, Cooke & Willcox,* for the defendant in error.

HOLT, J., delivered the opinion of the court.

During the late war, the Federal Government, for military purposes, built on the water front at Norfolk what was and is known as the Army Base. It is a marine terminal, adequately equipped with docks, piers, warehouses, trackage and necessary accessories. After hostilities had ended, in 1920, the city of Norfolk took over and operated this terminal under lease from the Government and continued to operate it until September 1, 1925, when that contract was terminated by mutual consent. The Norfolk Tidewater Terminals, Inc., a Virginia corporation, was then organized, and in its turn took over and has continued this terminal until to-day, under leases from the Federal Government.

The Norfolk & Portsmouth Belt Line Railroad Company, a Virginia corporation, is, as its name indicates, a belt or switching line and is a common carrier. It runs around Norfolk and Portsmouth and connects with and serves the eight main line railroads which terminate in these cities, together with accessible industrial plants. None of these railroads has direct connections with the plaintiff company; all deliveries to and from plaintiff are made over the Belt Line. The manner in which business was and is done is not in dispute. It is the practice of defendant, on inbound movements, to collect cars from the line haul carriers and industrial plants along its route and assemble them into trains at Boush Junction, from which point one of its engines transports the train and places it on the "hold" tracks located inside the "chain gate" at the Army Base. Its employees in charge of the train then furnish plaintiff with a list of the cars in the train so placed. Upon receiving information that this has been done, plaintiff designates the pier, warehouse or shipside to which the respective cars are to be placed or "spotted." Outgoing cars are moved from piers and shipsides, sometimes by the Terminal Company, sometimes by the Belt Line. In the terminal yards they are made up by the Belt Line into trains and taken away.

When the plaintiff took over these premises, the defendant prepared and submitted to it a contract which contained, among others, these provisions:

"1. The Terminal agrees to maintain, subject to the approval of the proper officer of the Belt Company, any and all tracks over which the Belt Company may operate with its engines and cars in making deliveries of freight to, or taking deliveries of freight from the Terminal."

"3. In further consideration of the advantages and benefits to accrue to the said Terminal on account of the operation of said tracks by the Belt Company, the said Terminal agrees to indemnify and protect and save harmless the said Belt Company from all claims of whatever character for damages by reason of fire originating from the locomotives of the Belt Company while doing work for the Terminal and resulting in the burning or destruction of, or injury to, the property of the Terminal, and property in its care, custody or control."

"4. The Terminal also agrees to indemnify and hold harmless the Belt Company from all loss, damage, or injury arising from any act or omission of the Terminal, its employees, or agents, to the person or property of the parties hereto, or to their employees, and to the person or property of any other person or corporation while on or about said tracks, but if any claim or liability other than from fire shall arise from the joint or concurring negligence of both parties hereto, it shall be borne equally by them."

"9. The Belt Company shall deliver to and receive from the Terminal cars of freight billed to and by the Terminal, and will place cars for loading and unloading as indicated by the Terminal."

"10. Belt Company service shall cover the same spotting service as performed by the railroads in this vicinity at their own piers, and/or public warehouses, and any additional service required shall be charged for in accordance with legally published Belt Line tariffs. Charges for Belt Company service shall accrue to the Belt Company."

"11. That the Belt Company will pay to the Terminal twenty-five (25c) cents per loaded car for use and maintenance of tracks through the Army Supply Base *owned by the United States Government* on all traffic handled for the account of the Terminal over the tracks in the Army Supply Base."

"19. It is distinctly understood and agreed by and between the parties hereto that either party shall have the right to terminate this agreement either at the expiraion of five years from said first day of September, 1925, or at any time thereafter upon giving to the other party hereto ninety (90) days written notice of its intention so to do, notwithstanding the expressed provision herein set forth that this agreement shall continue in force so long as the Terminal is lessee of the said premises designated in this agreement."

These conditions sought to be imposed are not usually regarded as unreasonable. *Imperial Wheel Co.* v. *St. Louis, etc., R. Co.,* 20 I. C. C. 56. But be that as it may, the plaintiff was unwilling to accept them and so matters stood; business went on and goes on as usual. For seven years and eight months prior to the period for which this action is brought, the defendant in monthly payments paid to plaintiff in the aggregate $37,601.75. Since that time 43,-718 cars have been transported by the defendant over the plaintiff's tracks. If compensation be paid therefor, on the basis of previous payments, that is to say, at twenty-five cents a car, there would be due $10,929.50. This is the amount of the jury verdict. Plaintiff has spent during that time in the maintenance of its own tracks $16,828.38. There is a perfect maze of them; end on end they would cover eighteen or twenty miles and are an indivisible part of the terminal itself. Piers without tracks to supply them freight would be of little value and so would tracks which lead to nothing.

This is an ordinary action of *assumpsit* and rests upon the common count. Plaintiff in substance contends that it has rendered to the defendant valuable services for which

it should be paid on a basis recognized. By way of defense, it is said that plaintiff's claim rests upon no valuable consideration, that there was no express contract, and conceding, for the sake of argument, that there was an implied one, it has been terminated by notice. It further contends that even if this claim rested upon an express contract, it would be illegal under federal laws and regulations.

The general law as to liability on implied contracts or on a *quantum meruit* is not in dispute. Even a disclaimer in advance of liabilities may be wholly ineffectual. If the Belt Line were to inform the Virginian Railway that it would no longer pay for the use of a storage track and thereafter continue to use it, this notice would amount to nothing; and for the same reason, if there was any liability upon this Belt Line for its use of the terminal tracks in shifting cars, no notice can relieve it of that liability for shiftings thereafter made.

Does plaintiff's claim rest upon any consideration at all?

If this Belt Line were to make up a train load of freight cars from other carriers which, for any reason, were to be shipped from the Norfolk & Western piers and were to take them to that terminal, it is obvious that neither the Norfolk & Western Railway nor its Terminal Company, if it be a separate corporation, could charge the Belt Line for that service or for any part of it. If, after taking them there and placing them upon a receiving track, it should, for the convenience of that railroad, break up this train and distribute its cars in such manner as to make their unloading more convenient, plainly this would be a gratuitous service.

" * * * it is not part of the duty of a carrier, either at common law or under the act, to spot cars at warehouses or factories, or to do more than to set them on the spur track and off their own right of way." *Imperial Wheel Co.* v. *St. Louis, etc., R. Co., supra.*

In *Crane Co. Terminal Services,* 210 I. C. C. 210, the Commission said:

"A carrier's duty involves only one placement of a car, the movement to be made without interference. *Downey*

*Ship Building Corp.* v. *Staten I. R. T. R. Co.,* 60 I. C. C. 543. Switching, spotting, and weighing operations performed by an industry for its own convenience and benefit are not a part of the transportation service which carriers could or should be required to render. *U. S. Cast Iron P. & F. Co.* v. *Director General,* 57 I. C. C. 442. We have held in many cases that the placing of cars on tracks within the plant inclosure constitutes delivery by carriers under their line-haul rates, and that assumption of cost by carriers for service performed beyond such points is unlawful. *Terminal Allowance to St. Louis Coke & Iron Co.,* 85 I. C. C. 591, 600, and cases cited therein."

These rulings were affirmed in *United States* v. *American Sheet & Tin Plate Co.,* 301 U. S. 402, 57 S. Ct. 804, 81 L. Ed. 1186.

"Spotting" cars, where conditions are simple, is sometimes regarded as a part of the work of the carrier.

For example, a carrier should place a car by a factory where there is but one convenient spur track, but no such duty can be imposed where a train of cars is intended for a plant whose receiving yard is a mazy network. *New York Cent. & H. R. R. Co.* v. *General Electric Co.,* 219 N. Y. 227, 114 N. E. 115, opinion by Cardozo, J. But where the duty of "spotting" cars may be properly imposed, the carrier does not have to pay for that service. When once properly placed and thereafter shifted, a switching charge may be imposed. *Chesapeake & O. Ry. Co.* v. *Westinghouse, etc., Co.,* 138 Va. 647, 649, 123 S. E. 352.

The obligations of a common carrier to "spot" cars in terminals and in private yards is thus stated in Roberts, Federal Liabilities, etc., section 194:

"The obligation of a common carrier concerning the delivery and receipt of car-load freight to and from private sidings and industrial tracks is restricted to the acceptance and delivery at a point on the siding a sufficient distance from the point of connection with the tracks of the carrier to clear such tracks. The carrier is not required to place

or 'spot' cars at such points on an industrial railroad that the shipper may designate."

It was the Belt Line's duty to place incoming cars at a point where they could be conveniently taken over by the Terminal Company; when outgoing cars were to be handled, their duties were reversed. If the Belt Line did more than this, its service was gratuitous. Certainly it should not be made to pay the Terminal Company for performing duties resting primarily upon the plaintiff.

We have seen that this plaintiff has kept up its own tracks in its own yard and has done so at considerable expense to itself. This is as it should have been. A man who shingles his own house must pay for it.

"In the absence of a contract by which defendant was obligated to maintain said side track and trestle, or of an order of the Corporation Commission made under legislative authority, defendant cannot be held liable to plaintiff for the cost of making repairs, although necessary, upon the side track or trestle located on plaintiff's property, and used for plaintiff's benefit." *Aileen Mills, Inc.* v. *Norfolk-Southern R. Co.*, 194 N. C. 647, 140 S. E. 306, 307. See also, *Jones* v. *Newport News, etc., Co.* (C. C. A. 6th), 65 Fed. 736; *Erie & Wyoming Valley R. R. Co.* v. *Public Service Commission of Pa.*, 74 Pa. Super. Ct. 338.

We are not here dealing with torts inflicted, and where a railway knew, or ought to have known, that the private track over which it was operating was unsafe; nor are we dealing with doubtful provisions in an express contract, which have been construed by the parties themselves.

It is perfectly true that the Belt Line for a number of years paid these charges for shifting cars without protest. Why, we do not know, probably because it failed to call counsel into conference and was not advised of its rights. The fact that the Terminal Company repaired its own tracks is not a consideration. Later, and upon reflection, the Belt Line reached the conclusion it was not liable therefor and refused to continue to make them. Plainly it was not liable and so had a right to refuse to do something

which it was not obliged to do. This appears to have been recognized by the plaintiff, who, although it thought that the charge was a proper one, recognized that it could not be enforced, and in a letter of July 2, 1934, addressed to Mr. W. H. Brown, Asst. to Genl. Comptroller, U. S. Shipping Board, MFC, Washington, D. C., who wished to know why this source of income had been omitted in its reports, said:

"In connection with these letters, for your information wish to advise that at the time the Norfolk Tidewater Terminals took over the operation of the Army Base in 1925 there was in existence an agreement between the Belt Line and the city whereby the Belt Line paid the operator of the Army Base twenty-five cents per car as trackage right, which compensation materially aided in the maintenance of the extensive layout of tracks at Norfolk.

"The company enjoyed this revenue up to the date of Mr. Loyall's letter of April 7th. We had no contract with the Belt Line and naturally we have been unable to force them to continue to pay this charge. As indicated in Mr. Miller's letter of April 25th to Mr. Loyall, we continued to bill the Belt Line on the same basis, and are yet of the opinion that this is a proper charge and the Belt Line should honor our bills."

The Belt Line is a railroad and a common carrier and is subject to control by the Interstate Commerce Commission and by our State Corporation Commission, each within its own sphere.

We have seen that there was no express contract. Had there been, it would have been illegal and therefore unenforceable. This claim cannot be charged against the Belt Line as an expense incurred, such as track repairs, but is a tariff charge assessed against each car and as such must have been approved and published.

The Belt Line's tariff sheets were agreed upon after a conference with the plaintiff; certainly after conference and without protest. In it are these provisions:

"For the use of wharves, warehouses, slips, channels, tracks and approaches and other facilities at the Norfolk

Tidewater Terminals, Norfolk, Virginia, and for other services rendered by the Norfolk Tidewater Terminals, as Agent for the Norfolk & Portsmouth Belt Line Railroad Company, the Norfolk & Portsmouth Belt Line Railroad Company makes an allowance, equal in the amount of charges provided in this tariff, to the Norfolk Tidewater Terminals, except storage when held in cars which accrues to Norfolk and Portsmouth Belt Line Railroad Company."

It is not contended that these sheets cover the plaintiff's claim. Statutes require that they should. U. S. C. A., Title 49, Sec. 6 (7) ; Va. Code, sec. 3910. And these statutes must be obeyed. *Chicago & Alton R. Co.* v. *Kirby,* 225 U. S. 155, 32 S. Ct. 648, 56 L. Ed. 1033, Ann. Cas. 1914A, 501; *Norfolk-Southern R. Co.* v. *Whitehurst,* 117 Va. 542, 85 S. E. 458.

In *Southern Cotton Oil Co.* v. *Central of Georgia Ry. Co.* (D. C.) 204 Fed. 476, and in *Southern Cotton Oil Co.* v. *Central of Georgia Ry. Co.* (C. C. A. 5th) 228 Fed. 335, a claim quite like that in judgment came under review. The railway was willing to pay, provided payment was not illegal. But the court said that since the charges asserted did not appear in any duly published schedule of tariffs (U. S. Comp. St. 1913, sec. 8569; 49 U. S. C. A., section 6), it could not be paid.

The net result of such an allowance would in substance amount to a discrimination in favor of the plaintiff against the Southgate Terminal and against every other terminal and industrial plant served by the Belt Line. If the Southgate Terminal were paid a bonus, doubtless the plaintiff would promptly complain. Inequalities are sometimes inevitable, but they are never sustained except for compelling reasons.

Cases dealing with tariffs and with their publication are without number, but with one voice they declare that schedules must be both approved and published. Even if they were approved and not published, they would be ineffectual because no one could know what they were. The

efforts which are being constantly made to establish uniform rates would be ineffectual.

For reasons stated, the judgment appealed from must be affirmed, and it is so ordered.

*Affirmed.*