GREAT LAKES STEEL CORP. *v.* DETROIT, TOLEDO &
IRONTON RAILROAD CO.

1. JUDGMENT—RES JUDICATA—DIFFERENT SUBJECT MATTER.
    Action to recover damages from railroad for failure to receive
    and deliver intrastate carload line-haul freight shipments from
    and to plaintiff's intraplant tracks was not controlled by dis-
    missal of former action between same parties for collection
    of terminal allowances alleged to have been due from defend-
    ant to plaintiff on shipments prior to those involved in present
    suit.

2. SAME—RES JUDICATA—JURISDICTION.
    Proceeding before public service commission to recover same
    terminal allowances against same defendant was not *res ju-
    dicata* of action at law in circuit court for such purpose where
    petition therein was dismissed for lack of statutory jurisdic-
    tion to determine the matter and leave to appeal from such
    decision was denied by this Court (2 Comp. Laws 1929,
    § 11026, subd. [g], § 11062).

3. PUBLIC SERVICE COMMISSIONS—POWER TO AWARD DAMAGES—CAR-
    RIERS.
    The power of the public service commission to award damages
    against carriers is limited to cases where the rate charged is
    irregular or exorbitant but such limitation does not have the
    effect of releasing or waiving any right of action for damages
    (2 Comp. Laws 1929, § 11026, subd. [g], § 11062).

4. CARRIERS—LINE-HAUL CONTRACTS—DELIVERY TO CONSIGNEE'S
    SIDETRACKS.
    In the absence of a tariff covering the matter of terminal allow-
    ances on intrastate line-haul contract of carriage, the contract
    is not fully performed until the carrier delivers the cars to

---

* Continued from Vol. 316.
*Res judicata* and jurisdiction over the subject matter, see Restate-
ment, Judgments, § 10.
Interest as an item of damages for breach of contract, see 1 Re-
statement, Contracts, § 337.

a consignee's sidetracks within the consignee's plant area that are available, but the carrier is not required to separate the cars and deliver them on the consignee's respective intraplant tracks at points of loading or unloading and performance of the carrier's full duty in respect to intrastate shipments is not released by the fact that it would be inconvenient for the carrier to separate interstate from intrastate shipments in order to perform it (2 Comp. Laws 1929, § 11022).

5. SAME—SHIFT BY CONSIGNEE WITHIN OWN PLANT—TERMINAL ALLOWANCE.

Shifts or transfers made by consignees over tracks within their own plants after the arrival of goods on intrastate shipments are not a part of the transportation by the carrier and an allowance therefor to the consignee therefor would be an unlawful discrimination (2 Comp. Laws 1929, § 11022).

6. SAME—TERMINAL ALLOWANCE—REMAND—EVIDENCE.

Where case is remanded for redetermination of plaintiff's damages for terminal allowances on intrastate line-haul freight shipments because erroneous basis adopted by trial court allowed recovery for failure to move cars upon plaintiff's intraplant tracks, testimony may be taken not only to determine plaintiff's damage for carrier's failure to move such cars onto plaintiff's storage tracks immediately within its railroad entrance but also to determine whether or not and when such tracks became available for use by defendant carrier.

7. SAME—CONTRACTS FOR DISCRIMINATORY SERVICE.

A contract with a common carrier that provides for a discriminatory service not authorized by a tariff regulation is in violation of law (2 Comp. Laws 1929, § 11026, subd. [a]).

8. SAME—PRESUMPTIONS—RAILROADS.

A railroad company is presumed to know what its duty is as a common carrier as fixed by law.

9. SAME—TERMINAL ALLOWANCES—ESTOPPEL—PERFORMANCE OF CONTRACTS.

In action against carrier for terminal allowances on intrastate line-haul shipments, record did not justify a finding that plaintiff was estopped from bringing action or that plaintiff prevented defendant from the lawful performance of its contractual obligation.

10. SAME—LIMITATION OF ACTIONS—OVERCHARGES—BREACH OF CONTRACT.

Three-year statute of limitations applicable to overcharges collected by common carriers for intrastate transportation of

persons or freight is not applicable to action for breach of intrastate line-haul contract where carrier failed to deliver cars, consigned to plaintiff, upon its intraplant storage tracks (3 Comp. Laws 1929, § 13993).

**11.** SAME—FIXING RATES—DETERMINATION OF WHAT SERVICES SHOULD BE RENDERED FOR TARIFF RATES.

An action to recover damages for a carrier's breach of contract does not impose upon a court a duty either to fix rates or to determine what services should have been rendered in consideration of tariff rates, jurisdiction of a court being limited to determination of damages for breach of contract by carrier (2 Comp. Laws 1929, § 11062).

**12.** INTEREST—BREACH OF CONTRACT—CARRIERS.

No interest is allowable prior to finding of amount of damages on claim for breach of common carrier's intrastate line-haul contracts for carriage of freight, where amount of damage was not ascertainable by a fixed standard and was not liquidated until fixed by court, sitting without a jury interest being recoverable from and after determination of amount of damage (2 Comp. Laws 1929, § 9238).

Appeal from Wayne; Miller (Guy A.), J. Submitted October 11, 1946. (Docket No. 60, Calendar No. 43,404.) Decided April 8, 1947.

Action by Great Lakes Steel Corporation against Detroit, Toledo & Ironton Railroad Company for damages for failure to place cars at points of loading and unloading within plaintiff's plant. Judgment for plaintiff. Defendant appeals. Reversed and remanded.

*Semmes, Goodrich & McEvoy,* for plaintiff.

*Bodman, Longley, Bogle, Middleton & Armstrong* (*Wallace. R. Middleton* and *Harold A. Johnson,* of counsel), for defendant.

NORTH, J. In this case, tried in the circuit court without a jury, plaintiff had judgment and damages for breach of contract in the amount of $59,359.66.

Defendant has appealed. The questions as presented by the respective parties may be stated in general terms but with sufficient accuracy as follows:

(1) During the period involved (July 4, 1938–March 15, 1942) was defendant common carrier. obligated to deliver and pick up freight cars used incident to plaintiff's shipments in intrastate commerce over defendant's lines at points on tracks within the area of plaintiff's plant designated as the scrap track, the brick track and the open hearth tracks; or were defendant's contracts of carriage fully performed by defendant leaving and picking up such cars on its so-called interchange or exchange tracks which were adjacent. to or in the general vicinity of plaintiff's plant site?

(2) Was interest on damages recoverable for a period prior to the date of judgment or at least prior to the date of bringing suit?

In respect of the first of the above questions, plaintiff's claim is stated in its brief as follows:

"It is plaintiff's contention that under the linehaul rates which it paid to the defendant for the transportation of shipments moving in intrastate commerce to and from plaintiff's plant at Ecorse, Michigan, plaintiff was entitled to delivery of the cars. This whole controversy relates to the point at which delivery should have taken place on carloads handled during the period July 4, 1938, to February (March) 15, 1942. There is no dispute that the cars were delivered to plaintiff on tracks that belonged to the defendant outside of the confines of the plaintiff's plant. Plaintiff claims that under the contract of carriage the defendant should have delivered these cars at certain points within plaintiff's plant; that it demanded such delivery, that the defendant refused to perform such delivery and as a result, the plaintiff was damaged to the

extent of the reasonable cost of moving the cars from the points on defendant's tracks where they were actually delivered to the points on plaintiff's tracks where plaintiff claims they should have been delivered.''

Defendant's contention is that its contract in transporting plaintiff's freight shipments was fully performed by delivery of the cars on defendant's exchange tracks which extend along the west side of plaintiff's plant area. From these exchange tracks there are spurs extending into plaintiff's property to the points of loading or unloading the cars, and these spur tracks are so arranged that the cars might be delivered on the various tracks according to the type of material constituting the particular shipment. One of these spurs is designated the scrap track, one the brick track, and others the open hearth tracks. The unloading points are approximately half a mile from the railroad entrance to plaintiff's plant. During the period involved, defendant, notwithstanding plaintiff demanded that it should do so, refused to deliver the freight cars used in intrastate shipments on the tracks within plaintiff's plant, and instead left such cars on defendant's exchange tracks outside of plaintiff's plant. In consequence of defendant's refusal plaintiff was compelled to use its own motive power in moving the cars to the tracks within its plant and in moving outgoing cars to defendant's exchange tracks. It is this refusal of defendant to perform these services which plaintiff claims constitutes a breach of defendant's line-haul contract. This primary phase of the controversy narrows down to the question of law as to whether, in the absence of any tariff regulation of intrastate shipments except the line-haul rate, it was the duty of the carrier to receive cars from plaintiff's intraplant tracks, above

noted, and to deliver them on such tracks, or at least within plaintiff's plant area.

Since in the instant case the controversy concerns only intrastate shipments and is not controlled by tariffs or rulings incident to interstate commerce, we may at the outset eliminate as not being controlling decisions (in which these same litigants were involved) made incident to rulings of the interstate commerce commission or decisions of the Federal courts involving interstate shipments. Likewise, we are of the opinion that the instant suit is not controlled by the dismissal of a former suit instituted in the circuit court of Wayne county by plaintiff against defendant. That suit, evidently in assumpsit, was for collection of terminal allowances alleged to have been due from defendant to plaintiff on shipments prior to those involved in the instant suit. Plaintiff's claim, in the instant suit for breach of contract, arises from transactions none of which were involved in the former suit in Wayne county. Obviously that suit was not *res judicata* of the instant suit. We are also of the opinion that dismissal of a proceeding brought by plaintiff herein before the Michigan public service commission based upon the same transactions that are involved in the instant suit and which was dismissed on the ground of lack of jurisdiction, followed by this Court's denial of plaintiff's application for leave to appeal from the commission's decision, does not bar recovery in this suit. Our conclusion in this respect is justified because dismissal by the commission was properly based upon the commission's holding that it was without jurisdiction to try the controversy presented. The holding of the commission was in accord with, and necessitated by, the applicable statutory provisions in this State which limit the Michigan public service commission's power to

award damages to cases where "the rate or charge exacted is irregular or exorbitant.'" 2 Comp. Laws 1929, § 11026, subd. (g) (Stat. Ann. § 22.29 [g]) ; and further that "This act shall not have the effect to release or waive any right of action by the State or by any person for any right, damage, penalty or forfeiture which may have arisen or which may hereafter arise under any law of this State." 2 Comp. Laws 1929, § 11062 (Stat. Ann. § 22.64).

While we do not deem it controlling of decision herein, it may be noted that from February 15, 1932 to July 4, 1938, the pertinent portion of the tariff filed by defendant with the Michigan commission expressly provided for a terminal allowance of $1.27 per car payable by defendant to plaintiff, the latter during that period having used its own motive power to move cars from defendant's exchange tracks to the desired points within plaintiff's plant. The period just above noted immediately preceded the period during which plaintiff seeks to recover in the instant case; and during the period involved in the instant case there was no tariff regulation in effect as to intrastate shipments which provided for a terminal allowance. But again, effective March 15, 1942, by local freight tariff No. 1315-A, a terminal allowance of $1.27 per car applicable to such transactions as are involved in the instant case was provided. It is the absence of such a tariff provision as to intrastate shipments during the period between July 4, 1938, and March 15, 1942, that has given rise to the instant litigation. As above noted, the controversy is whether, in the absence of a controlling Michigan tariff provision other than the line-haul rate, it was the duty of defendant carrier as a part of its intrastate line-haul to deliver inbound cars on plaintiff's respective tracks designated as its scrap track, brick track, open hearth

tracks, et cetera, and to pick up outbound cars from like locations within plaintiff's plant; or whether on the other hand, "the line-haul rates do not extend to such scrap, brick or open hearth tracks within plaintiff's plant" as asserted in appellant's brief.

As will shortly be noted, we are of the opinion that neither of the two contentions just above referred to is correct. Instead, under the circumstances of this case, a carrier has not fully performed its line-haul duty until it delivers the cars on the side tracks within plaintiff's plant area, provided such sidings are made available by plaintiff; but there the carrier's duty ends. The carrier is not required to separate the cars and deliver them on consignee's respective intraplant tracks at points of loading or unloading. *Grand Trunk W. R. Co.* v. *Mount Clemens Sugar Co.*, 277 Mich. 366. In other words, the defendant carrier was not required under its line-haul contract to deliver some of the cars on plaintiff's scrap track, some on its brick track, and others on the open hearth tracks, et cetera. But, under the circumstances of this case, delivery of a car by defendant was not completed until it was placed on plaintiff's siding within its plant area if such siding was made available by plaintiff. *Ward* v. *Pere Marquette Railway Co.*, 231 Mich. 323. On the other hand, discrimination would result, in the absence of appropriate tariff regulations, by requiring the carrier to render service to the consignee beyond that incident to delivery on consignee's tracks within its plant.

"Likewise, shifts or transfers made by consignees over tracks within their own plants after the arrival of goods are not a part of the transportation by the carrier, and an allowance therefor to the consignee has been regarded as a discrimination." 9 Am. Jur. p. 576.

Entirely apart from the foregoing authorities the duty of the defendant common carrier as to intrastate shipments under the circumstances· of the instant case, in our opinion, is fixed in this State by the following statutory provision.

"Any railroad, subject to the provisions of this act, upon application of any shipper tendering traffic for transportation, shall construct, maintain and operate upon reasonable terms a switch connection with any private side track, when such connection is reasonably practicable and can be put in with safety and will furnish sufficient business to justify the construction and maintenance of same, and shall furnish cars and transport to the best of its ability any traffic tendered to, over or from such side track, without discrimination in favor of or against any such shipper: Provided, This shall not be construed to compel a railroad to remove from or deliver on a private side track traffic tendered in less than car lots." 2 Comp. Laws 1929, § 11022 (Stat. Ann. § 22.25).

While the following text concerns interstate shipments, it seems equally applicable to intrastate shipments.

"The obligation of a common carrier concerning the delivery and receipt of carload freight to and from private sidings and industrial tracks is restricted to the acceptance and delivery at a point on the siding a sufficient distance from the point of connection with the tracks of the carrier to clear such tracks. The carrier is not required to place or 'spot' cars at such points on an industrial railroad that the shipper may designate. * * *

"The obligation of a common carrier service does not extend through the network of interior switching tracks, and any service by line carriers within the plant, without charge in addition to line-haul rate or any compensation to the industry or its in-

dustrial railway for performing the service, is unduly preferential and unlawful.'' 1 Roberts Federal Liabilities of Carriers (2 Ed.), p. 502.

The law as above stated has been followed in intrastate shipment cases.

''The obligation of a common carrier concerning the delivery and receipt of car-load freight to and from private sidings and industrial tracks is restricted to the acceptance and delivery at a point on the siding a sufficient distance from the point of connection with the tracks of the carrier to clear such tracks. The carrier is not required to place or 'spot' cars at such points on an industrial railroad as the shipper may designate.'' *Norfolk Tidewater Terminals, Inc.,* v. *Railroad Co.* (syllabus), 170 Va. 118 (195 S. E. 684).

Without in any manner or degree departing from the established law in this jurisdiction that courts are not vested with the power or authority to determine, independent of the statute or a published tariff or order of the public service commission, what service a carrier is bound to render or the rate the carrier may charge (see Const. [1908], art. 12, § 7, and *In re Manufacturer's Freight Forwarding Co.,* 294 Mich. 57), the decisions herein noted from other jurisdictions may well be considered as shedding some light upon what is the proper construction or interpretation to be given to the Michigan statute above quoted.

The New York Court of Appeals, Judge Cardozo writing the opinion, held:

''A railroad's duty to carry is a duty to carry over its right of way. Private sidings, owned and maintained by shippers, do not constitute the right of way, and the use that the carrier may be compelled to make of them is subordinate and incidental

to the fulfillment of its primary functions of carriage along its route. Reasonable delivery may involve trifling departures from the route, as where the carrier's engines, after switching cars upon a siding, move them a short distance to the doors or platforms of a factory. But reasonable delivery does not involve the carrier's cooperation in the division of labor and of functions between the sections of an extensive plant, and whenever complicated shifts and transfers are made by shippers or consignees within their own plants, they must be made at their own cost and without allowance from the carrier." *New York C. & H. R. Co.* v. *General Electric Co.* (syllabus), 219 N. Y. 227 (114 N. E. 115, 1 A. L. R. 1417) (Certiorari denied by the United States Supreme Court, 243 U. S. 636; [37 Sup. Ct. 400, 61 L. Ed. 941]).

The law applicable to the instant case is aptly stated as follows in 13 C. J. S. p. 324.

"Where, by contract or custom, delivery is to be made at an industrial plant having an elaborate intra-mural system of trackage, delivery is complete when the cars containing the consignment are hauled from the carrier's main line to the general storage track of the consignee within the limits of the latter's yard, and the carrier is not bound to distribute the cars along such intra-mural trackage system to the various mills and warehouses of the consignee."

To determine whether the rules of law as just above stated are applicable to the instant case it is essential to note the physical character of plaintiff's plant site, the extent of track facilities, the availability thereof for switching by defendant without interference by plaintiff's intraplant operations, et cetera. We quote the following from the opinion of the trial judge who simultaneously heard the instant case and one of like character by plaintiff against the New York Central Railroad Company.

"The plaintiff company * * * now occupies property several hundred acres in extent which is bounded on the east by the Detroit River below Ecorse, and on the west in part at least by the rights-of-way of the two railroad defendants. The plant now consists of a large number of buildings used for various purposes in the process of making steel. It has a very considerable mileage of railroad trackage for the purpose of making intra-plant deliveries in the process of manufacture, both of raw materials and of materials in process and of finished materials. It possesses motive power equipment in the form of locomotives operating under various kinds of power. Included in the railroad trackage is a considerable amount of space that can be used for switching purposes and storage purposes. This system of plant trackage is physically connected directly with the lines of the two defendants."

The physical connection of plaintiff's intra-plant trackage, just above referred to, is by means of tracks extending into plaintiff's plant area from defendant's exchange tracks. A blue print in evidence discloses that immediately inside the entrance to plaintiff's plant there now is a system of 10 or 12 parallel tracks for storage of cars without delivering them to points further within plaintiff's plant where the same are to be loaded or unloaded. Defendant's line-haul contracts required it to deliver inbound freight cars on this system of sidings within plaintiff's plant, and to pick up outgoing cars from the same area, provided such track facilities were available at the time of the shipments involved in this litigation.

The duty of the defendant as hereinbefore determined is, as noted, subject to the condition that plaintiff provided intraplant trackage reasonably suitable for the delivery of incoming cars and the picking up of outgoing cars by the defendant, ample

to accommodate the volume of plaintiff's inbound and outbound freight without interference by plaintiff's intraplant operations. However there is uncertainty in the record before us as to whether plaintiff's plant was or is so equipped during all of the period during which plaintiff seeks recovery— July 4, 1938 to March 15, 1942. Since the case must be remanded for further hearing, we leave this phase of the controversy open for determination by the trial court based on such further testimony as may be taken. The present condition of the record in this respect is disclosed by the testimony of plaintiff's director of transportation who on direct examination testified:

"This blue print  *  *  *  represents the plant layout substantially the way it was in 1938, there being few changes subsequent to that time.  *  *  *  I would say that this map shows the situation substantially as it was in 1942 and since 1937."

But on cross-examination the witness further testified:

"Well, the new construction took place in the area immediately east of the track scale (*i.e.,* where the sidings are located immediately inside the entrance to plaintiff's plant). Where there were only one or two running tracks in there, as you see there (indicating), we constructed an entire net-work of tracks, many additional cross overs were put in at the point north and east of the track scale, and, in general, the track lay-out was re-arranged to facilitate the movement of the locomotives and the cars.  *  *  *  Other changes have been made since then (1937). They are constantly being made as the need for greater efficiency arises."

Defendant's liability for breach of its line-haul contracts began July 4, 1938, or as soon thereafter

as plaintiff provided and kept available reasonable trackage for delivery and picking up cars within its plant area.

We are mindful of defendant's contention that since plaintiff's shipments consisted both of intrastate and interstate commerce, and since under the ruling of the interstate commerce commission defendant may not switch interstate shipment cars inside of plaintiff's plant but must deliver them on defendant's exchange tracks, great inconvenience will result in segregation of intrastate from interstate cars. The noted circumstance does not constitute a justification for holding defendant is released from full performance of its duty incident to intrastate shipments. If, because of the noted circumstance, defendant is entitled to relief, its remedy is by application to the Michigan public service commission.

The trial judge accepted plaintiff's contention that defendant carrier was obligated as a part of its line-haul to deliver and pick up cars at the points of loading and unloading on plaintiff's so-called scrap track, its brick track, or its open hearth tracks, a distance of approximately half a mile from the railroad entrance to plaintiff's plant site. Damages were assessed on that assumption. This was erroneous and may have resulted in excessive damages, based on the assumption that the service defendant was obligated to render was substantially greater than was lawfully required. This, together with the above noted uncertainty in the record as to when plaintiff provided suitable and available trackage inside its plant area for delivery and receipt of cars by defendant, necessitates remand of the case to the trial court for the taking of such further testimony as may be deemed material and decision accordingly.

As we view the record the above noted erroneous conclusion of the trial judge resulted largely from the contention of plaintiff about to be noted. As stated in the opinion of the trial judge:

"It (plaintiff) instructed (in 1938) all of its consignors to consign all cars to it under bills of lading or freight receipts which stated in substance and explicitly that the consignee was the Great Lakes Steel Corporation *at its loading points*. Under the testimony it is undisputed that all cars received during this period of time came into the plant of plaintiff under substantially this form of consignment. Whether you call the paper freight receipts or bills of lading each one was an express contract between the parties that the car or cars covered would be delivered to the company *at its unloading point*. It is a necessary corollary that after the cars were unloaded they would be taken up by the railroad at that point and taken off the company's property and back upon the railroad lines."

As contended by plaintiff and held by the trial judge, the above specification or indorsement having been made a part of each bill of lading constituted a contract by which the carrier was obligated as a part of its line-haul to deliver and pick up cars consigned to plaintiff at the respective points of unloading. Even though shipments or consignments of cars to plaintiff were made in the manner above indicated, still the question at once arises as to whether it was within the power of the parties concerned to make and be bound by such a contract. Clearly the parties did not have the power or right to enter into such a contractual relation, because in view of our holding herein as to what constituted proper delivery within defendant's line-haul contract as to intrastate shipments such a contract would be an attempt to provide for a discrimina-

tory service to be rendered plaintiff by defendant. It is elementary that as to common carriers such a contract in the absence of an appropriate tariff regulation, is in violation of law.    2 Comp. Laws 1929, § 11026, subd. (a) (Stat. Ann. § 22.29 [a]); *Grand Rapids & I. R. Co.* v. *Cobbs & Mitchell,* 203 Mich. 133.   Plaintiff's attempt to obligate defendant to render additional discriminatory service was void and is without bearing on decision herein.

As against plaintiff's right to recover defendant urges estoppel and that plaintiff's suit, at least in part, is barred by a statutory limitation.   We find nothing in this record which would justify holding plaintiff is estopped from bringing this suit against defendant.   The alleged liability is based upon a claimed breach of its duty as a common carrier as fixed by law.   Defendant is presumed to know what that duty was; and further nothing on the part of plaintiff is disclosed by this record which prevented defendant from the lawful performance of its contractual obligation.   Nor are we in accord with defendant's claim that plaintiff's cause of action, in part, is barred by the statutory provision found in 3 Comp. Laws 1929, § 13993 (Stat. Ann. § 27.631), which provides in part: "all actions against carriers for the recovery of *overcharges* collected by common carriers for the intrastate transportation of persons or property within the State of Michigan, shall be begun within three years of the time the cause of action accrues and not thereafter." * The instant suit is not one "for the recovery of overcharges collected," but instead, as noted above, is an action for a breach of contract.

In the instant case the cars were hauled by defendant under contracts in which the rates for the

* By amendment reduced to two years—Act No. 191, Pub. Acts 1945.

line-haul were fixed by the then prevailing tariff.
The justness of the rates is not questioned.   What
service defendant was required to render under its
line-haul contract was fixed by law.   Plaintiff's suit
is based on its claim that by defendant's failure and
refusal to render in full the services to which plain-
tiff was entitled under the shipment contracts, de-
fendant breached such contracts and damage re-
sulted to plaintiff.   This case in no way imposes
upon the Court an attempt to fix rates or what serv-
ices should have been rendered in consideration of
the tariff rates.   Each of these had been determined
by lawful authority.   While the power to fix rates
for a given service of this character is not within
the jurisdiction of the courts (*City of Detroit* v.
*Michigan Public Utilities Commission*, 288 Mich.
267), nonetheless by the statutory provision above
noted (2 Comp. Laws 1929, § 11062 [Stat. Ann.
§ 22.64]) a cause of action is reserved to "any per-
son for any right, damage, penalty or forfeiture
which may have arisen or which may hereafter arise
under any law of this State."

The remaining question presented on this appeal
is whether the trial court erred in including in its
amended judgment upwards of $12,000 as interest
which the court held plaintiff was entitled to recover
as having accrued to it prior to the date of judg-
ment.   In brief this interest item was computed on
the theory that on the first of each month during the
period covered by the suit there was due to plaintiff
from defendant $1.27 for each car which plaintiff
during the next preceding month had switched from
defendant's exchange tracks into plaintiff's plant.
We are of the opinion that recovery of such inter-
est was erroneously adjudged.   Our attention has
not been called to any decision in this State wherein
the right to recover interest under like circum-

stances has been adjudicated. In *Coan* v. *Township of Brownstown*, 126 Mich. 626, a negligence case, it was held since the defendant's liability as established was for the total loss of the property involved, interest on the value of the property was properly allowed from the date of the injury. While that was the proper rule as applied to that kind of case, we think it is not applicable to the instant case wherein plaintiff's damages are and will remain unliquidated until adjudication thereof. There is an extensive note on this phase of the law in 96 A. L. R. p. 18. At page 47 the following is quoted from *Midland Valley R. Co.* v. *Price*, 127 Okla. 106 (260 Pac. 26):

"The original cases on the subject make a distinction between unliquidated claims, which may be determined by fixed standards, such as current wages for repairing damages to property, the value of materials to replace destroyed property, and the like, and unliquidated claims, which may not be determined entirely by fixed standards, but which must be left to the sound judgment and discretion of the jury, or the court in the absence of the jury. In the former case, interest is allowable, while in the latter it is not. The reason for the rule is that in the latter case the person against whom the claim is made cannot ascertain the amount chargeable against him until the same has been judicially determined."

In this State we have the following statutory provision bearing upon this phase of the law. In part it reads:

"In all actions founded on contracts express or implied, whenever in the execution thereof any amount in money shall be liquidated or ascertained in favor of either party, by verdict,  *  *  *  it shall be lawful, unless such verdict  *  *  *  shall be set aside, to allow and receive interest upon such

amount so ascertained or liquidated, until payment thereof, or until judgment shall be thereupon rendered; and in making up and recording such judgment, the interest on such amount shall be added thereto, and included in the judgment." 2 Comp. Laws 1929, § 9238 (Stat. Ann. § 19.4).

The obvious purport of the above statute is that in an action such as the instant case interest should be computed from and after the date when, by a verdict of a jury or a finding of the court sitting without a jury, the damages have been liquidated or fixed by a judicial determination—*i.e.,* by the verdict of the jury or the finding of the court. See *Bolt* v. *Nelson,* 263 Mich. 158. Plaintiff seeks to recover unliquidated damages and under the circumstances of the instant case interest thereon is recoverable only from the time the amount of damages is ascertained by the court's finding.

The judgment entered in the circuit court is vacated and the case remanded for further hearing and adjudication in accordance herewith. Defendant will have costs of this Court.

Carr, C. J., and Butzel, Bushnell, Sharpe, Boyles, Reid, and Dethmers, JJ., concurred.