The TRAVELERS INSURANCE
CO., Plaintiff,

v.

SCM CORPORATION, et al.,
Defendants.

Civ. A. No. 83–1759.

United States District Court,
District of Columbia.

Dec. 21, 1984.

**494**

Gregory B. Macauley, Washington, D.C., for plaintiff.

Timothy A. Russell, Michael L. Gassmann, Drinker, Biddle & Heath, Washington, D.C., for defendant SCM.

## MEMORANDUM OPINION

THOMAS F. HOGAN, District Judge.

This diversity action for damages arises from a June 19, 1980 fire which resulted in damage to real property owned by 13th & E Street Associates and insured by plain-

tiff, Travelers Insurance Co. ("Travelers"). According to the allegations of the complaint, the fire originated with a coffee maker manufactured by defendant SCM Corporation ("SCM"). Travelers seeks recovery from SCM on a variety of legal theories including strict liability, express warranty, implied warranty, and misrepresentation.

Travelers has also joined Wells Fargo Alarm Services ("Wells Fargo") as a defendant alleging that the malfunction of an alarm system installed by Wells Fargo allowed the fire to spread extensively and multiplied the damages. Chesapeake and Potomac Telephone Co. ("C & P") was joined on the theory that the negligence of C & P in transmitting Wells Fargo's alarm signal over its telephone lines also contributed to the damage.

The complaint also names the United States Department of the Treasury ("Treasury Department") and the Bureau of the Mint ("Mint"), the lessees of the office space owned by plaintiff's insured, as well as two Mint employees, Cory Gillilland and Michael Burke. Plaintiff asserts that Gillilland and Burke negligently purchased and installed the coffee maker in violation of "regulations prohibiting the installation and use of employee owned electrical appliances in any Government occupied space." Amended Complaint at 11. Plaintiff also claims that the defendants' negligent installation and use of the coffee maker was a proximate cause of the fire. The liability of the Treasury and Mint allegedly arises from the "failure of the supervisors and managers to enforce the regulation ... prohibiting the use and installation of said coffee maker." *Id.* at 18.

SCM, Wells Fargo and C & P have filed cross-claims for indemnification and contribution against each other and the other defendants. The Treasury, Mint, Gillilland and Burke (the "Federal Defendants") have filed cross-claims against SCM, Wells Fargo and C & P. Several dispositive motions have been filed on a variety of grounds.

Each of these arguments will be addressed separately below.[1]

### I. *Wells Fargo's Motion For Partial Summary Judgment*

 Wells Fargo has filed a motion for summary judgment on the grounds that the contract between Wells Fargo and 13th and E Street Associates contains a valid and enforceable liquidated damages clause. The contract provides in part that:

Wells Fargo shall not be liable for any of subscriber's losses or damages, irrespective of origin, to person or property, whether directly or indirectly caused by performance or nonperformance of obligations imposed by this contract or by negligent acts or omissions of Wells Fargo, its agents or employees.

None of the parties to this lawsuit have filed any opposition to Wells Fargo's motion. In light of the clear and unambiguous language of the contract and the sophistication and bargaining power of the parties, the Court finds the contractual limitation of liability to be valid and enforceable. Wells Fargo's motion for summary judgment will be granted.

### II. *C & P Telephone's Motion to Dismiss*

 C & P has moved to dismiss on the grounds that District of Columbia Public Service Commission Tariff No. 201 ("Tariff") contractually limits its liability for any errors, omissions or defects in the transmission of telephone signals. This tariff provides that:

Liability of the telephone company for damages arising out of mistakes, omissions, interruptions ... or defects in transmission ... shall in no event exceed an amount equivalent to the proportionate charge to the customer for the service or facilities affected during the period such mistake, omission, interruption or defect in facilities continues after notice and demand ....

According to C & P, this tariff has the "force of law" and precludes recovery for any damages arising from its allegedly negligent failure to transmit Wells Fargo's alarm signal. Plaintiff and cross-claimants argue that the tariff is a mere contractual limitation on recovery and that it is possible to construe the complaint to allow third parties to recover. *See Conley v. Gibson*, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

Plaintiff, joined by the Federal Defendants, suggests that C & P is construing the tariff too broadly. According to plaintiff, the tariff limits the telephone company's liability to its "customers," but does not provide "blanket protection against liability to third parties." The parties agree that the service contract in question was voluntarily entered into by Wells Fargo and C & P, and that C & P's liability to Wells Fargo is thus limited by the tariff. However, plaintiff suggests that the tariff should not be construed to preclude C & P's liability to third parties—such as plaintiff and cross-claimants—to whom C & P owes a duty of due care. In essence, plaintiff argues that it should not be bound to the terms of the tariff because the tariff is part of a contract between C & P and Wells Fargo, to which plaintiff is not a party. This argument has some initial appeal.

Upon closer examination, however, it appears that plaintiff's argument is flawed in several respects. First, the Court has examined the cases cited by the parties without finding any suggestion that a distinction should be made between a utility "customer" and a "third party." On the contrary, the relevant precedents speak in quite broad terms of the need to limit the liability of the public utilities. *See e.g., Willhite v. South Central Bell Telephone Co.*, 693 F.2d 340, 343 (5th Cir.1982); *Pilot Industries v. Southern Bell Telephone & Telegraph Co.*, 495 F.Supp. 356, 361 (D.S.C. 1979); *Holman v. Southwestern Bell Tele-*

---

1. Several of the claims and issues raised by various parties do not merit serious attention and will not be discussed in this opinion.

phone Co., 358 F.Supp. 727, 729 (D.Kan. 1973).

Second, the plaintiff's argument is persuasive only when it is phrased in terms of contract: "the plaintiff and cross-claimants should not be 'bound' by the contract to limit liability between C & P and Wells Fargo." Although it is possible to think of the tariff as part of the framework of the service contract, plaintiff's claims against C & P are founded not on contract but on the broader duties of tort law.[2] More importantly, the tariff is not merely a private limitation on liability between the bargaining parties but a binding public regulation—established as a matter of public policy—to limit the liability of C & P. Shehi v. Southwestern Bell Telephone Company, 382 F.2d 627, 629 n. 2 (10th Cir.1967).

This broader view of the public policy nature of the tariff suggests that it would be unwise to create a third party exception to C & P's limited liability. The setting of rates for C & P is entrusted to the Public Service Commission, and their decision to limit liability is "an inherent part of the rate." Western Union Telegraph Company v. Esteve Brothers & Co., 256 U.S. 566, 571, 41 S.Ct. 584, 586, 65 L.Ed. 444 (1921). This Court is not persuaded that it would be either sound law or sound policy to disturb the current status of local telephone company liability.

Finally, the Court is uncertain whether the customer-third party distinction which plaintiff urges is conceptually sound or practically feasible. Consider, for example, a stockbroker whose telephone service is interrupted for twenty-four hours because of the negligence of the telephone compa-

ny. Cf. Abraham v. New York Telephone Co., 85 Misc.2d 677, 380 N.Y.S.2d 969, 972 (1976). All parties would agree that the tariff effectively precludes the stockbroker from recovering damages from the phone company for his lost commissions. The plaintiff would argue, however, that some third parties should be allowed to recover. Would the term "third parties" include the broker's customers who tried to call the stockbroker to place a buy or sell order? If so, should they be allowed to recover their lost profits (or losses) from the phone company? It would appear that the customers of the broker are certainly "third parties" in terms of the service contract between the phone company and the broker. One might argue, however, that the broker's customers are also "customers" of the phone company's services[3] and, as such, should not be allowed to recover. The fact that the broker's customers are easily categorized as both "third parties" and "customers" suggests that the bright line rule offered by plaintiff might not exist.

One might also consider the example of stock underwriters and the stock-issuing companies themselves. These parties may suffer lost profits as a result of the breakdown of the broker's phone lines. They would seem to be, under plaintiff's proposed distinction, the type of third parties who may recover. They are clearly not, with respect to the transaction at issue, "customers" of telephone service. Yet, it is difficult to conceive of a rationale to explain why only the most remote parties with the most speculative damages should be allowed to sue.[4] It is also difficult to

---

**2.** The parties have argued about the extent to which a utility company owes a "duty" of care to third parties who may suffer injury because of the utility's failure to provide services. Some courts have been reluctant to find such a duty, see Reimann v. Monmouth Consolidated Water Co., 9 N.J. 134, 87 A.2d 325 (1952); others draw a line between "misfeasance" and "nonfeasance." See East Coast Freight Lines, Inc. v. Consolidated Gas Co. of Baltimore, 187 Md. 385, 50 A.2d 246 (1946). This Court need not reach this issue, but will assume, without deciding, that in accordance with the modern trend in the law, C & P's duty of due care will run to all

foreseeable plaintiffs. The Court will further assume that the plaintiff and cross-claimants fall within this broadened scope of duty.

**3.** In fact, the losses suffered by the broker's customers are as much a result of the phone company's breach of a service contract with the attempted callers (the customers) as they are of any breach of contract with the broker.

**4.** Even if the contract theory is used, one still has difficulties in developing an explanation why third parties—and not "customers"—should

discern a principled basis for distinguishing "customers" from "third parties." Any party that suffers a loss because of a failure of phone service is to some extent a customer of the phone company in the sense that it is receiving a (potential) benefit from its services. When the hypothetical stockbroker's phone is out of order, he is not the only telephone customer whose service is impaired—everyone loses at least their ability to call him. The fact that there are so many potential customers with so great a potential loss is the very reason that the liability-limiting tariff exists.

In short, the Court can find no basis for creating an exception to the settled doctrine of limited liability. The obvious policy choice to shield C & P from damage claims in exchange for the benefit of lower rates further suggests that the tariff should be applied to all parties—not just those who contracted for the services in question. The Court will thus dismiss defendant C & P Telephone Company.

### III. *Federal Defendants Motion to Dismiss, or, in the Alternative, for Summary Judgment*

The Federal Defendants have moved for dismissal, or summary judgment, on a variety of grounds. Plaintiff, Travelers Insurance Company, as well as SCM Corporation and C & P Telephone, have filed partial oppositions to the motion.

### A. *Sovereign Immunity*

■ It is clear, at the outset, that plaintiff has failed to comply with the requirements of the Federal Tort Claims Act (F.T.C.A.), 28 U.S.C. § 2675(a). Because the F.T.C.A. constitutes the only basis for a waiver of sovereign immunity "for money damages for injury or loss of property ... caused by the negligent or wrongful act ... of any employee of the government," the claims against the agencies of the United States must be dismissed. 28 U.S.C. § 2679. *See United States v. Mitchell,* 445 U.S. 535, 100 S.Ct. 1349, 63 L.Ed.2d 607 (1980); *Larson v. Domestic & Foreign Commerce Corp.,* 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949).

■ Plaintiff and cross-claimants have argued that the claims against the government employees may be maintained despite the absence of jurisdiction over the United States and the individual agencies. The question of whether sovereign immunity bars suit against a federal officer or employee turns on the "nature and effect" of the claim. *Larson v. Domestic & Foreign Commerce Corp.,* 337 U.S. 682, 691, 69 S.Ct. 1457, 1462, 93 L.Ed. 1628 (1949); *Land v. Dollar,* 330 U.S. 731, 738, 67 S.Ct. 1009, 1012, 91 L.Ed. 1209 (1947). If the claim is in effect against the government, and if an award of damages "would expend itself on the public treasury," *Land* at 738, 67 S.Ct. at 1012, the claim is against the United States and may be barred by sovereign immunity.

■ In the present case, the defendants Burke and Gillilland are sued in both their official and individual capacities. It is clear that a claim against a federal employee in his or her "official capacity" is in effect a claim against the government. The sovereign immunity doctrine cannot be evaded by changing the label on the claims or the parties. *See e.g., Larson,* 337 U.S. at 687, 69 S.Ct. at 1460; *Hutchinson v. United States,* 677 F.2d 1322, 1327 (9th Cir.1982). On the other hand, the existence of the Federal Tort Claims Act does not preclude all claims for damages against government employees in their individual capacities. *See Neely v. Blumenthal,* 458 F.Supp. 945, 953–55 (D.D.C.1978); *but see* 28 U.S.C. § 2679 (F.T.C.A. provides exclusive remedy against federal employees for damages resulting from operation of motor vehicles). Accordingly, only the claims

---

recover. For example, in the hypothetical above, the stockbroker's customers, as well as the stockbroker, are contracting with the phone company and are "customers" of telephone service. If the other potential plaintiffs, such as the underwriters, are going to attempt to recover under a contract theory as "third party beneficiaries" of the service contract, they are going to be bound by the terms of the same contract as the stockbroker.

against Gillilland and Burke in their individual capacities may go forward.

## B. Statute of Limitations

Defendants argue that the Court should adopt the two year statute of limitations contained in the F.T.C.A., 28 U.S.C. § 2401, and apply it to the individual federal defendants in this case.[5]

■ The Federal Defendants admit that there is no precedent for such a position but argue that the judicial adoption of the rule is necessary for reasons of fairness and uniformity. For the reasons set forth below, the Court declines to modify the established rule of allowing the individual claim to go forward despite the statutory bar to pursuit of the claim against the federal government.

The Federal Defendants argue that the "dual" period of limitations for federal employees in their individual and official capacities encourages blatant disregard of the Federal Tort Claims Act. The Court does not believe this to be the case. The most important incentive for meeting F.T.C.A. requirements is the possibility of obtaining the federal government, with its ability to pay, as a defendant. The fact that individual defendants—with infinitesimally smaller resources—may still be subject to liability is a small consolation to the plaintiff who willfully disregards the statutory scheme.

The Federal Defendants also argue that adopting the shorter F.T.C.A. limitation period will result in a "fairer" trial. They suggest that a uniform two-year period will guarantee the availability of records and provide "fresher memories" of the incident in question. This is certainly true, but a statute of limitations represents a balancing of the advantages of the need for repose and a relatively speedy trial against the plaintiff's need for a fair amount of time to make his claim. That balancing has already been done by the District of Columbia government.

It should be recalled that under the *Eire* Doctrine, the local statute of limitations is a substantive rule of law which is controlling in federal court. *Guaranty Trust Co. of New York v. York*, 326 U.S. 99, 109, 65 S.Ct. 1464, 1469, 89 L.Ed. 2079 (1945). While the Congress may have authority to establish a statute of limitations as part of the framework under which the United States partially waives sovereign immunity and the federal courts may have some authority to adopt rules within that framework, this Court has no authority to modify substantive state law.

## C. Failure to State a Claim of Negligence per se

■ Plaintiff and cross-claimants assert, as a basis of liability, that Gillilland and Burke violated an internal Federal Property Management Regulation § 101–20.110; 41 C.F.R. § 101–20.110 (Appendix B), which requires building manager approval prior to the installation of "employee-owned electrical appliances." Although the individual federal defendants may not have obtained "approval" pursuant to Reg. § 110–20.110, the Court agrees with the defendants that this alleged failure cannot form the basis of a claim of negligence *per se*.

It is obvious from the wording of the regulation that the duty to obtain approval rested not on the individual employees but on the agency itself. The regulation provides: "An *agency* desiring to have an employee-owned electrical appliance installed in a building under the jurisdiction of GSA shall submit a request in writing to the GSA buildings manager ...." If the appropriate regulations and requirements are not met, "the *agency* will be requested to order its removal." Nothing in the regulation appears to establish any duty on the part of individual employees to comply with its requirements. Because the agency has been dismissed from this suit, the Court need not decide the legal effect of noncompliance with the regulation on the agency's tort liability. With respect to the individu-

**5.** In the absence of such an innovation by this Court, the suit would proceed as the case was admittedly filed within the local limitation period.

al defendants, a statute that creates no duty cannot be the basis of liability.

The absence of a claim of negligence *per se* does not mean, however, that the claim against the individual federal defendants must be dismissed. It is conceivable that plaintiff and cross-claimants may be able to prevail in their claims of negligent use or installation of the coffee maker. Amended Complaint, ¶ 46, Cross Claim of SCM Corporation, ¶¶ 3, 4. While these allegations may prove difficult to establish at trial, they are factual matters that remain in dispute and, as such, are not appropriate for disposition at the present time. Thus, plaintiff and cross-claimants may proceed against the Federal Defendants Burke and Gillilland, in their individual capacities, only on the theory of negligent use or installation.

### D. *Immunity of Federal Officials*

■ The "generally accepted rule" is that federal officials are "totally immune from suit for damages attributed to any common law tort emanating from non-ministerial conduct within the outer perimeter of his official authority." *Expeditions Unlimited Aquatic Enterprises v. Smithsonian Institution*, 566 F.2d 289, 300 (D.C.Cir. 1977) (footnotes omitted), *cert. denied*, 438 U.S. 915, 98 S.Ct. 3144, 57 L.Ed.2d 1160 (1978); *Barnwell v. Cordle*, 438 F.2d 236 (5th Cir.1971). This immunity is based on the principle that "officials of the government should be free to exercise their duties unembarrassed by the fear of damage suits in respect of acts done in the course of those duties …." *Barr v. Matteo*, 360 U.S. 564, 570, 79 S.Ct. 1335, 1339, 3 L.Ed.2d 1434 (1959).

The question before this Court is whether the allegedly negligent conduct of federal defendants Burke and Gilliland falls within the "outer perimeter" of their official duties. If so, defendants are immune from tort liability for injury resulting from such conduct. *Barr*, 360 U.S. at 576, 79 S.Ct. at 1342.

■ In determining whether the acts in question—involving the preparation and consumption of coffee—fall within the grant of immunity, the Court recognizes that the range of activity covered by the immunity is quite broad. To retain immunity, an official's acts "must simply be within the ambit of the authority and have some connection with the general matters committed to his control or discretion." *Donahoe v. Watt*, 546 F.Supp. 753, 755 (D.D.C.1982) (*citing Goodwin v. Briggs, cert. denied*, 437 U.S. 904, 98 S.Ct. 3089, 57 L.Ed.2d 1133 (1978)). In other words, activities not "manifestly or palpably beyond [a government official's] authority" are within the official's jurisdiction for purposes of the immunity doctrine. *Simons v. Bellinger*, 643 F.2d 774 (D.C.Cir.1980) (*quoting Spalding v. Vilas*, 161 U.S. 483, 498, 16 S.Ct. 631, 637, 40 L.Ed. 780 (1896)).

■ Plaintiff, Travelers, and cross-claimants, SCM and C & P, filed oppositions to the individual federal defendants' motions to dismiss. These oppositions do not challenge the legal basis of the grant of immunity as set forth above. Rather, they argue that the conduct of defendants Gillilland and Burke cannot properly be considered to be within the outer perimeter of their official duties.

At the outset, it is argued that the purchase and use of the coffee maker was a violation of government regulations and hence beyond the normal course of duty. However, as noted *supra*, the regulation in question in no way prohibited individual agency personnel from installing electrical appliances. The conduct in question was neither required nor prohibited but was within the discretion of the individuals involved.

The arguments in opposition also suggest that the conduct in question was too "ministerial" or too far removed from the policy-making sphere to fit easily within the *Barr v. Matteo* framework. Clearly, one of the central themes of the doctrine of absolute immunity, as enunciated in *Barr*, is the protection of policymaking decisions from possible attack in the Courts. The *Barr* Court specifically discussed the im-

portance of removing the threat of common law liability "which might appreciably inhibit the fearless, vigorous, and effective administration of policies of government." *Barr*, 360 U.S. at 570, 79 S.Ct. at 1339.

This is clearly not a case which deals with discretionary official conduct or policy-level decisionmaking. Instead, the conduct in the present case might be thought of as discretionary *personal* conduct—it was clearly a permitted but certainly not a required element of the defendant's official acts.

In determining the scope of employment for purposes of the *respondeat superior* doctrine, courts have long considered certain "personal" activities to be so necessary, usual, and closely tied in to the workplace that they are considered to be within the scope of employment. *See, e.g., Brown v. Anzalone*, 300 F.2d 177 (3rd Cir.1962) (lighting fire to stay warm); *George v. Bekins Van & Storage Co.*, 33 Cal.2d 834, 205 P.2d 1037 (1949) (smoking); *J.C. Penney Co. v. McLaughlin*, 137 Fla. 594, 188 So. 785 (1939) (going to restroom). Certainly, obvious distinctions may be made between the immunity policy of *Barr* and the *respondeat superior* doctrine. Nevertheless, the Court finds the scope of employment opinions instructive in their recognition of discretionary personal activities as an integral part of the workplace.

The Court is concerned, however, that a holding placing the activities in this case within the realm of absolute immunity will stretch that doctrine out of context and create a gap between the liability of public employees and their private counterparts that the Supreme Court never intended to create. Although the conduct of defendants Gillilland and Burke may be considered lawful, within their discretion, and even within the scope of their employment, it is not the type of activity which requires the blanket protection of the absolute immunity doctrine. The Court recognizes that the language of *Barr* and its progeny is quite broad but nevertheless believes that a distinction may be drawn between discretionary personal activities and discretionary official duties.

This is so because of the nature of official decisionmaking. At the policy level, many of a government official's actions and decisions have at least the potential to cause some injury to someone. Any such injury—even in the form of a denial of a benefit—may be readily pled in the form of a common law tort by a competent attorney. Thus, the absolute immunity afforded by *Barr* is a necessary shield from a potential onslaught of lawsuits—"suits which would consume time and energies that would otherwise be devoted to governmental service . . . ." *Barr*, 360 U.S. at 570, 79 S.Ct. at 1339.

Any lawsuit against a government employee will consume time and energy, but only a suit involving official acts will "appreciably inhibit the . . . effective administration of policies of government." *Id.* In short, the doctrine of absolute immunity exists to protect and encourage government officials in making difficult decisions involving the operation of government. Personal decisions and activities, such as the coffee-making in the instant case, do not need the same protection and encouragement.

Finally, the Court notes that Congress has immunized federal employees from tort liability for injuries arising from automobile accidents occurring within the scope of employment. *Thomason v. Sanchez*, 539 F.2d 955 (3rd Cir.1976) (limited exclusivity provision of F.T.C.A. immunizes government employee from individual liability). Although the somewhat shopworn maxim *expressio unius est exclusio alterius* does not compel the Court to the opposite conclusion with respect to other types of job-related conduct, the limited nature of the exception does suggest an intent to treat public employees on the same terms as their private colleagues in the ordinary run of cases. The Court believes that the congressional judgment is not in any way contrary to the holding of *Barr*, which also provides a narrow exception to the usual rule of individual liability. Thus, although

the congressional intent is not controlling on the issue at hand, this Court declines to expand the immunity provided by *Barr v. Matteo* far beyond its original intent and in a fashion that would effectively override the Congressional judgment evinced in the Federal Tort Claims Act. The motion of the individual federal defendants to dismiss on the grounds of absolute immunity is denied.

An appropriate order will be entered in accordance with the terms of this Opinion.