## CIRCUIT COURT OF STAFFORD COUNTY

Harvey L. Pettit

    v.

Chesapeake & Potomac
Telephone Co. of Va. and
Contel of Virginia, Inc.

            Case No. (Law) 770–91

National Bank of Fredericksburg,
Joseph D. O'Connell, Co-Executor,
and Russell H. Roberts, Co-Executor
of the Estate of
Veronica A. McGinn Pettit, deceased

    v.

Chesapeake & Potomac
Telephone Co. of Va. and
Contel of Virginia, Inc.

            Case No. (Law) 771–91

Gordon P. Peyton,
Executor of the Estate of
Velma H. Rexrode, deceased

    v.

Chesapeake & Potomac
Telephone Co. of Va. and
Contel of Virginia, Inc.

            Case No. (Law) 772–91

Deborah S. Pettit

v.

Chesapeake & Potomac
Telephone Co. of Va. and
Contel of Virginia, Inc.

Case No. (Law) 773–91

May 6, 1992

By Judge James W. Haley, Jr.

In these four related cases, defendants Chesapeake & Potomac Telephone Company of Virginia and Contel of Virginia, Incorporated ("the utilities") have demurred and filed Special Pleas in Bar to pleadings alleging them liable for failure of Enhanced 911 Emergency Telecommunications Services ("E-911 Services").

Pursuant to its Miscellaneous Service Arrangements Tariff and its provisions on Universal Emergency Number 911 Services, Defendant Chesapeake & Potomac Telephone Company of Virginia entered into a contract in 1986 with Stafford County to provide E-911 services.

Likewise, pursuant to its General Exchange Tariff and its provisions on Universal Emergency 911 Service, Defendant Contel of Virginia, Incorporated, entered into a contract in 1989 to lease to Stafford County equipment for E-911 services.[1]

As authorized by Code § 58.1–3813, Stafford County enacted an ordinance in 1986 establishing a utility tax payable by consumers to fund the costs of establishing and providing E-911 services. Though this tax is paid to the utilities, the utilities, less administrative costs, remit the revenue to the County.

In salient substance the contractual relationship between the utilities and Stafford County provides that the former will supply tele-

---

[1] The court takes judicial notice of these tariffs pursuant to Code § 8.01–386.

phone routing equipment for 911 calls to public safety answering points (PSAPS) manned and maintained by the County's Emergency Service Agency ("ESA"),[2] which is responsible for the dispatch of emergency services.

This relationship is subject to a tariff. A "tariff" is a public document approved by a regulatory entity setting forth the services. A tariff consists of:

> rates and charges with respect to services and governing rules, regulations and practices relating to those services.

*Black's Law Dictionary*, 6th Ed. 1990, p. 1457.

In pertinent part, Contel's E-911 Tariff reads as follows:

> D. *Conditions*
>
> 1. The Company provides 911 Service solely for the benefit of the ESA operating the PSAP. The provision of 911 Service by the Company shall not be interpreted, construed or regarded, either expressly or implied, as being for the benefit of or creating any Company obligation toward any third person or legal entity other than the ESA . . . .
>
> 14. The Company's entire liability to any person for interruption or failure of 911 Service, whether due to the Company's network facilities or to the 911 terminal equipment, shall be limited to the terms set forth in this section and other sections of this tariff . . . .
>
> 17. The Company's liability for any loss or damage arising from errors, interruptions, defects, failures or malfunctions of this service or any part thereof whether caused by the negligence of the Company or otherwise shall not exceed an amount equivalent to the pro rata charges for the service affected during the period of time that the service was fully or partially inoperative.

Likewise, C&P's E-911 Tariff (incorporating provisions of its General Regulations Tariff) reads in part:

> 5. *Liability of the Telephone Company*
>
> a. This service, like all of the Telephone Company's other services, is offered subject to the general terms and conditions contained in the General Regulations Tariff and in par-

---

[2] The Stafford County Sheriff's Department.

ticular the Liability of the Telephone Company provisions of that tariff . . . .

*Service Irregularities*

The liability of the Telephone Company for damages arising out of mistakes, omissions, interruptions, mistakes, omissions, interruptions, delays, errors or defects in transmission, or failures or defects in facilities furnished by the Telephone Company, occurring in the course of furnishing service or other facilities and not caused by the negligence of the customer, shall in no event exceed an amount equivalent to the proportionate charge to the customer for the service or facilities affected during the period such mistake, omission, interruption, delay, error or defect in transmission, or failure or defect in facilities continues after notice and demand to the Telephone Company.

When facilities of others are used in establishing connections to points not reached by the Telephone Company's facilities, the Telephone Company is not liable for any act or omission of others furnishing such facilities.

*Third Parties*

Provision of service to a customer shall not create, nor give to, any third party any claim or right of action against the customer or Telephone Company.

Hereafter, these quoted terms will be referred to as the "tariff provisions."

In *Rosillo v. Winters*, 235 Va. 268, 270, 367 S.E.2d 717, 717 (1989), the Virginia Supreme Court reiterated that:

A demurrer admits the truth of all material facts properly pleaded. Under this rule, the facts admitted are those expressly alleged, those which fairly can be viewed as impliedly alleged, and those which may be fairly and justly inferred from the facts alleged.

Accordingly, and because of the complex factual situations here involved, the court sets forth verbatim the following relevant facts common to each of the four Motions for Judgment:

3. [Harvey] Pettit is, and was at all times pertinent hereto, a resident of Stafford County, Virginia, whose address is 602 Fagan Drive, Fredericksburg, Virginia 22405 (hereinafter the "home").

4. At all times pertinent hereto, C&P and Contel supplied telephone services, including telephone emergency services known as 911 (hereinafter "911") to the Pettit home.

5. On December 19, 1989, an intruder entered the Pettit home intending to rob the occupants. At that time, located within the home were Pettit, Veronica A. McGinn Pettit, wife of Pettit, Velma H. Rexrode, a friend and business associate, and Pettit's daughter-in-law, Deborah S. Pettit.

6. The intruder asked for a ride to a local hotel as a ruse to get Veronica A. McGinn Pettit and Deborah S. Pettit out of the home. Veronica A. McGinn Pettit and Deborah S. Pettit went into the garage with the intruder to get into the car, whereupon the intruder locked Deborah S. Pettit in the trunk of the car and took Veronica A. McGinn Pettit back into the home.

7. While the intruder took Veronica A. McGinn Pettit back into the kitchen of Pettit's home, Deborah S. Pettit escaped from the trunk of the car and ran next door to her own home, whereupon she immediately dialed 911 and received a busy signal. Deborah A. Pettit repeatedly dialed 911 and each time received a busy signal. Unable to reach emergency personnel by dialing 911, Deborah S. Pettit then dialed the operator.

8. The intruder took Veronica A. McGinn Pettit back into the home whereupon he proceeded to rob, then shoot, Veronica A. McGinn Pettit.

9. After the intruder shot Veronica A. McGinn Pettit, he left the home of Harvey L. Pettit and Veronica A. McGinn Pettit and went next door to the home of Deborah S. Pettit and violently attempted to enter her home in an effort to kill her, while Deborah S. Pettit was on the telephone waiting to be connected to emergency personnel.

10. Back in the home of Pettit, Pettit, who had been watching television in the den of his home, heard a commotion and went into the kitchen whereupon he found his wife, Veronica A. McGinn Pettit, had been shot. He immediately used the telephone in the kitchen and dialed 911 but received a busy signal. Pettit then went back into the den to use the den telephone and dialed 911 repeatedly but received a busy signal each time.

11. During the time the 911 system failed to connect Pettit to emergency personnel, the intruder had re-entered the home of Pettit and had shot Velma H. Rexrode. The intruder proceeded toward the den and met Pettit as he was returning to the kitchen to retry the kitchen telephone. The intruder attempted to shoot Pettit, a struggle occurred, and the intruder shot Pettit twice and left the home.

12. Pettit, who had been severely wounded, made his way back into the den and dialed 911, where again he received a busy signal. Unable to reach emergency personnel by dialing 911, Pettit then dialed the operator.

13. When Deborah S. Pettit was finally connected with the Stafford County Sheriff's Department by the operator, she was required to give her name, address and location because the information was not automatically available to the Sheriff's Department due to the failure of the 911 system.

14. When Pettit was finally connected with the Stafford County Sheriff's Department by the operator, he was required to give his name, address and location because that information was not automatically available to the Sheriff's Department due to the failure of the 911 system.

15. Because of the failure of the 911 system, Pettit's call and Deborah S. Pettit's call to the Stafford County Sheriff's Department had to be operator-assisted, valuable time being lost in getting emergency and police personnel to the home.

16. Had the first calls by Pettit and Deborah S. Pettit been connected through 911, police and emergency personnel would have had an opportunity to respond to the scene and prevent the attack upon Deborah S. Pettit, wounding of (Harvey) Pettit, the deaths of Veronica A. McGinn Pettit and Velma H. Rexrode, and the escape of the intruder.[3]

---

[3] This intruder was ultimately apprehended and, in accordance with a multi-state plea bargain involving Virginia, Tennessee and Arkansas, is presently incarcerated in Arkansas for life without possibility of parole.

On the foregoing facts, each of the Plaintiffs allege liability against the utilities in separate counts, one in tort and one in contract.[4]

As required by Code § 8.01–273, the utilities have set forth a number of specific grounds in support of their respective demurrers. Rather than address each of these grounds, the court will consider one, as well as the Special Pleas in Bar, finding each dispositive.

### *The Special Pleas in Bar*

Succinctly stated, the utilities maintain the Circuit Court of Stafford County is without jurisdiction to entertain these cases.

The utilities are public service companies[5] subject to the jurisdiction of the State Corporation Commission ("SCC").[6] Pursuant to Article IX, § 2, of the Constitution of Virginia, 1971, the SCC is granted the power and "charged with the duty of regulating the rates, charges and services . . . of . . . telephone companies."

Article IX, § 4, states that no other court of the Commonwealth shall have jurisdiction to: "review, correct or annul any action of the Commission . . . in the performance of its official duties . . . ." except the Supreme Court of Virginia.

Pursuant to Code § 56–35, the SCC:

> shall have the power, and be charged with the duty, of supervising, regulating and controlling all public service companies doing business in this State, in all matters relating to the performance of their public duties and their charges therefor, and of correcting abuses therein by such companies.

Code § 56–236 requires public service companies to file with the SCC:

> schedules showing rates and charges . . . and as a party of . . . such schedules . . . copies of all rules and regulations that in any manner affect the rates charged . . . .

---

[4] The pleadings of the executor of the estate of Velma H. Rexrode and the executors of the estate of Veronica A. McGinn Pettit are wrongful death actions pursuant to the provisions of § 8.01–50.

[5] Code § 56–1 defines a "public service company" as including "telephone companies . . . ."

[6] Code § 12.1–12 states that the SCC shall regulate "rates, charges, services . . . of all public service companies as defined in § 56–1 . . . ."

In *Atlas Underwriters v. State Corp. Commission*, 237 Va. 45, 49, 375 S.E.2d 733, 735 (1989), the court stated:

> We conclude that the framers of Article IX, § 4, intended that the Supreme Court have exclusive jurisdiction over all challenges to all actions of the SCC, both judgmental and ministerial.

Earlier in *Little Bay Corp. v. VEPCO*, 216 Va. 406, 409, 219 S.E.2d 677, 679 (1975), the Virginia Supreme Court stated:

> We believe the prohibition of Article IX, Section 4, applies whether Commission action is attacked directly or collaterally. If, in either case, the challenge requires review leading to reversal, correction, or annulment of Commission action, the constitutional section, in no uncertain terms, forecloses jurisdiction to any Virginia court save this tribunal.
>
> Neither is the result different because the challenge to Commission action arises in the prosecution of a common law contract claim. If, to grant relief upon such a claim, a trial court would be required to review and reverse, correct, or annul any action of the Commission, Article IX, Section 4, would oust the court of jurisdiction.

Reflecting these constitutional jurisdictional limits are the provisions of Code § 56–480 which in part provide:

> The reasonableness, justice, and validity of any rate, charge, rule, regulation or requirement on file with the Commission for any telephone company shall not be questioned in any suit brought by any person in the courts of this State against any such telephone company, wherein is involved the charges of such company for the transmission of messages, or the efficiency of the public service, and in all the courts of this State, they shall be conclusively presumed to be reasonable, just, and valid.

Eighty years ago, the then Supreme Court of Appeals, in dealing with a challenge in a circuit court to the consolidation of two stock companies, stated in *Winfree v. Riverside Cotton Mills*, 113 Va. 717, 726, 75 S.E. 309, 312 (1912), that:

> The State Corporation Commission having approved the consolidation of the two corporations and issued the certifi-

cate prescribed . . . the trial court properly held, under the plain language . . . of the Constitution, that it had no jurisdiction to set aside or annul the consolidation thus effected.

It seems clear that the tariff provisions are "rules and regulations" concerning "the efficiency of the public service . . ." provided by the utilities. For the plaintiffs to prevail, a Circuit Court would be required to "review, correct or annul . . ." the tariff provisions. This a Circuit Court is without jurisdiction to do, and accordingly, the Special Pleas in Bar are granted. When such a plea is granted, it provides an absolute defense. *Nelms v. Nelms*, 236 Va. 281, 289, 374 S.E.2d 4, 9 (1988).

### The Tariff Defense

In addition to their Special Pleas in Bar concerning jurisdiction, each of the utilities have demurred on the ground the tariff provisions require the court to conclude that the Plaintiffs' allegations are insufficient as a matter of law.

Deborah S. Pettit and Harvey L. Pettit each allege that they were:

charged on . . . [their] . . . C&P telephone bill for 911 service and . . . paid . . . [their] . . . telephone bill in full . . . and C&P and Contel failed to provide the 911 Service that they had contracted to provide . . . .

The executors of the estate of Veronica A. McGinn Pettit and the executor of the estate of Velma H. Rexrode each claim their decedents were third party beneficiaries of the alleged contracts between Harry L. Pettit and/or Deborah S. Pettit and the utilities.

All plaintiffs allege the utilities were negligent in providing E-911 services.

Though it appears evident that the utilities contracted with Stafford County, not Deborah S. Pettit or Harvey D. Pettit, and that that portion of their payment to the utilities for E-911 services was a tax ultimately remitted to Stafford County, the court will nonetheless address their contractual claims, as well as those of the executors, in addition to the tort claims common to all plaintiffs.[7]

---

[7] Deborah S. Pettit and Harvey L. Pettit by inference concede they have no contractual relationship with the utilities. In their reply memorandum, they state that "the force of the tariff is limited to the relations between the company and its customers (here-

The majority of American jurisdictions hold that exculpatory or liability limitation provisions in a tariff provide a valid defense from those in a direct contractual relation with the utility, whether those claims are based on contract or tort or both. *See, Simpson v. Phone Directors, et al.*, 82 Or. App. 582, 729 P.2d 578, 580–581 (1986); *Warner v. Southwestern Bell Telephone Co.*, 428 S.W.2d 596 (Mo. 1968); *Computer Tool & Engineering*, 453 N.W.2d 569 (Minn. App. 1990); *Travelers Ins. Co. v. SCM Corp.*, 600 F. Supp. 493 (D.C. 1984); *Professional Answering Service v. C&P Telephone Co.*, 565 A.2d 55 (D.C. App. 1989); *Southern Bell Telephone Co. v. Invenchek, Inc.*, 204 S.E.2d 457 (Ga. App. 1974); *Mendell v. Mountain State Tel. & Tel. Co.*, 117 Ariz. 491, 573 P.2d 891 (1977); *Tramell v. Western Union Tel. Co.*, 57 Cal. App. 3d 588, 129 Cal. Rptr. 361 (1976); 74 Am. Jur. 2d, *Telecommunications*, § 66; 67 A.L.R. 3d 76, "Failure of Telephone Service," § 16, pp. 124–130. And most recently, *MCI Telecommunications Corp. v. Premium Marketing Systems, Inc.*, 1992 WL 6693 (N.D. Ill. Jan. 15, 1992).[8]

Three California decisions upholding the tariff defense are instructive.

In *Cole v. Pacific Tel. & Tel. Co.*, 112 Cal. App. 2d 416, 419, 246 P.2d 686, 688 (1952), a California appellate court stated:

> The theory underlying these decisions is that a public utility, being strictly regulated in all operations with considerable curtailment of its rights and privileges shall likewise be regulated and limited as to its liabilities. In consideration of its being peculiarly the subject of state control, "its liability is and should be defined and limited." *Correll v. Ohio Bell Telephone Company, supra.* There is nothing harsh or inequitable in upholding such a limitation of liability when it is thus considered that the rates as fixed by the Commission

---

inafter Stafford County) . . . ." (p. 5).

[8] A number of these jurisdictions hold that the tariff defense does not apply to "willful and wanton" acts by the utility. There are no such allegations in the pleadings of Harvey Pettit or the various executors. Deborah Pettit alleges that "C&P intentionally inflicted . . . distress and anguish . . ." This quoted language is conclusionary and therefore not admitted on demurrer. *Caplan v. Stant, Ex'r.*, 207 Va. 933, 935, 154 S.E.2d 121, 122–123 (1967). The quoted facts common to each pleading set forth above are insufficient as a matter of law to conclude that C&P acted intentionally with respect to Deborah S. Pettit.

are established with the rule of limitation in mind. Reasonable rates are in part dependent upon such a rule.

Again, in *Davidian v. Pacific Tel. & Tel. Co.*, 16 Cal. App. 3d 750, 753, App. 94 Cal. Rptr. 337, 339 (1971), the court stated:

It appears that in approving tariff rules with reference to limitation of liability of a telephone company, the commission has considered such limitation of liability in conjunction with the rates for service fixed by the commission.

Citing both these cases, the Supreme Court of California, *en banc*, 114 Cal. Rptr. 753, 758, 523 P.2d 1161, 1166 (1974), noted that:

We agree that ordinarily a provision which is intended to limit one's liability for negligence must clearly and explicitly express that purpose and that it is for the courts to determine whether or not the provision possesses the requisite precision and clarity . . . Yet, as we have pointed out . . . general principles which might govern disputes between private parties are not necessarily applicable to disputes with regulated utilities. Pacific's use of a credit allowance provision as a means of limiting its liability for ordinary negligence has been considered and approved by the commission and taken into account in setting its rates. Were the courts permitted to reappraise and reinterpret the language of commission-approved tariff schedules in the guise of "judicial construction," the supervisory and regulatory functions of the commission set forth above could easily be 'undermined.[9]

---

[9] In *Discount Fabric House v. Wisc. Tel. Co.*, 117 Wisc. 2d 587, —, 345 N.W.2d 417, 426 (1984), dealing with the omission of a business listing in the "yellow pages," the court did not accept the damage limitation provisions of the tariff a proper defense: "This exculpatory clause in the modern commercial world is unconscionable and unenforceable since it is contrary to public policy."
The Wisconsin court did so, however, after acknowledging it based its decision on *Allen v. Mich. Bell Tel. Co.*, 18 Mich. App. 632, 637–640, 171 N.W.2d 689, 692–694 (1969): "The *only* case from all courts considering the merits of the telephone company's exculpatory clause to find it to be against public policy. (Emphasis supplied)." 117 Wisc. at —, 345 N.W. at 424.
With respect to a public policy argument, it should be noted that by Chapter 537 of the 1989 Acts of Assembly (House Bill 1748), the statutory duties set forth in Chap-

In *Western Union Telegraph Company v. Esteve Brothers & Co.*, 256 U.S. 566, 41 S. Ct. 584, 65 L. Ed. 1094 (1921), the erroneous delegation of a naught in a message to sell for future delivery bales of cotton resulted in a loss of $31,095.00. A tariff filed with the Interstate Commerce Commission limited liability for negligent transmission to a portion of the toll paid.

In upholding this limitation, Justice Brandeis stated:

> The limitation of liability was an inherent part of the rate. The company could no more depart from it than it could depart from the amount charged for the service rendered . . . Uniformity demanded that the rate represent the whole duty and the whole liability of the company. It could not be varied by agreement; still less could it be varied by lack of agreement. The rate became, not, as before, a matter of contract, by which a legal liability could be modified, but as a matter of law, by which a uniform liability was imposed. Assent to the terms of the rate was rendered immaterial because, when the rate is used, dissent is without effect. 256 U.S. at 569–573.

The Supreme Court of Virginia has upheld tariff provisions limiting liability for telegraph companies subject to federal regulatory commissions. *See Williams & Sons, Inc. v. Postal Telegraph-Cable Co.*, 122 Va. 675, 95 S.E. 436 (1918); *Western Union Tel. Co. v. Bolling*, 120 Va. 413, 91 S.E. 154 (1917); *Boyce v. Western Union Tel. Co.*, 119 Va. 14, 89 S.E. 106 (1916). The court has also recognized such tariff provisions applicable to carriers in interstate commerce. *Greyhound Lines v. Mah*, 216 Va. 401, 405, 219 S.E.2d 842, 844–845 (1975); *Eastern Coal & Export Corporation v. Norfolk & W. Ry. Co.*, 148 Va. 140, 138 S.E. 471 (1927); *Norfolk & P. Belt Line R. Co.*, 170 Va. 118, 195 S.E. 684 (1938).

---

ter 15, Article 2 of Title 56, then applicable to telephone and telegraph companies, including the provisions of Code § 56–476 prohibiting contracts against the utilities' negligence, were amended by the deletion of any reference to telephone companies. When the General Assembly changes the provisions of a statute, it is to be concluded "that the legislature was consciously and deliberately selective." *Geico v. Universal Underwriters Ins. Co.*, 232 Va. 326, 329, 350 S.E.2d 612, 614 (1986). It is a fair inference, therefore, that even if a tariff is viewed as a contract against a telephone company's negligence, the same is not contrary to public policy.

For example, relying upon *Massaponax Sand Corp. v. Va. E. & P. Co.*, 166 Va. 405, 413, 186 S.E. 3, 7 (1936), the Virginia Supreme Court in *Chesapeake & Potomac Tel. Co. of Virginia v. Bles*, 218 Va. 1010, 1012–1013, 243 S.E.2d 473, 476–477 (1978), held that the utility was not equitably estopped from collecting undercharges mistakenly afforded its customer by a contract between the parties, as the rate therein was in conflict with the rate prescribed by the utility's tariff.

The pinion upon which the plaintiffs base their claim is *Vendola v. Southern Bell Tel. and Tel. Co.*, 474 So. 2d 275 (Fla. App. 4 Dist., 1985), *reh. den.*, 486 So. 2d 597 (Fla. 1986).

There the utility had contracted with Broward County, Florida, to supply 911 service to the county Sheriff's Office.[10] This was not enhanced 911 services in that the equipment did not display the address from which a 911 call emanated.

Gunshot, Vendola called 911 and said "Ambulance. Quick." at 12:23 p.m. and, unable to say more, died at 2:10 p.m. The Sheriff's Office requested the utility to trace the call and give them an address. The utility was unable to do so before Vendola died. Vendola's executor filed suit in tort. The court acknowledged that the general services tariff "has the force and effect of law between these parties for services arising thereunder." 474 So. 2d at 278.

The tariff conditions included a disclaimer of relationship with anyone other than the customer, a damage limitation for interruption of service, and an indemnity provision whereby the customer would hold the utility harmless from third party claims.

---

[10] The contract between Broward County, Florida, and the utility was executed pursuant to the Florida Emergency Telephone Act, § 365.171, Florida Statutes (1983). This court has obtained a copy and may take judicial notice of the same pursuant to § 8.01–386. Though the Florida court makes reference to this *statute*, this court finds it inexplicable why the Florida court did not address the issue necessarily raised by § 365.171(14), which reads: "(14) Indemnification and limitation of liability.—All local governments are authorized to undertake to indemnify the telephone company against liability in accordance with the telephone company's lawfully filed tariffs. Regardless of any indemnification agreement, the telephone company shall not be liable for damages resulting from or in connection with "911" service or identification of the telephone number, address, or name associated with any person accessing "911" service, unless the telephone company acted with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property in providing such services."

Nonetheless, the court held that, even though the utility's contract with Broward County did not include enhanced 911 services, that is, to include address display, the utility, at the request of the Sheriff's Office, volunteered to trace the call and supply the address in this instance. In this endeavor, the court concluded, the utility assumed a common-law duty to the decedent to do so without negligence, and the tariff did not extend to bar the plaintiff.[11]

What the Plaintiffs in this cause seek is a third party exception to the tariff defense, that is, to ignore those portions of both utilities' tariffs which shield them from third party claims.

This specific issue was addressed in *Travelers Ins. Co. v. SCM Corp.*, 600 F. Supp. 493 (D. D.C. 1984). After paying a property damage claim caused by fire, the plaintiff insurance company sued SCM, the manufacturer of a coffee pot allegedly the source of the fire, Wells Fargo, whose alarm system allegedly malfunctions, and Chesapeake and Potomac Telephone Company:

> on the theory that the negligence of C&P in transmitting Wells Fargo's alarm signal over its telephone lines also contributed to the damage.

C&P's Tariff limited its liability "to customers." The court's reasoning is hereafter set forth in detail:

> According to C&P, this tariff has the "force of law" and precludes recovery for any damages arising from its allegedly negligent failure to transmit Wells Fargo's alarm signal. Plaintiff and cross-claimants argue that the tariff is a mere contractual limitation on recovery and that it is possible to construe the complaint to allow third parties to recover . . . .
>
> Plaintiff . . . suggests that C&P is construing the tariff too broadly. According to plaintiff, the tariff limits the telephone company's liability to its "customers" but does not provide "blanket protection against liability to third parties." The parties agree that the service contract in question was voluntarily entered into by Wells Fargo and C&P and

---

[11] Compare *R. C. v. Southwestern Bell Tel. Co.*, 759 S.W.2d 617 (Mo. App. 1988), where the court concludes there is no common law duty in similar 911 circumstances.

that C&P's liability to Wells Fargo is thus limited by the tariff. However, plaintiff suggests that the tariff should not be construed to preclude C&P's liability to third parties—such as plaintiff and cross-claimants—to whom C&P owes a duty of due care. In essence, plaintiff argues that it should not be bound to the terms of the tariff because the tariff is part of a contract between C&P and Wells Fargo, to which plaintiff is not a party. This argument has some initial appeal . . . .

Although it is possible to think of the tariff as part of the framework of the service contract, plaintiff's claims against C&P are founded not on contract but on the broader duties of tort law. More importantly, the tariff is not merely a private limitation on liability between the bargaining parties but a binding public regulation—established as a matter of public policy—to limit the liability of C&P. *Shehi v. Southwestern Bell Telephone Company*, 382 F.2d 627, 629, n. 2 (10th Cir. 1967).

This broader view of the public policy nature of the tariff suggests that it would be unwise to create a third party exception to C&P's limited liability. The setting of rates for C&P is entrusted to the Public Service Commission, and their decision to limit liability is "an inherent part of the rate." *Western Union Telegraph Company v. Esteve Brothers & Co.*, 256 U.S. 566, 571, 41 S. Ct. 584, 586, 65 L. Ed. 444 (1921).

Finally, the Court is uncertain whether the customer-third party distinction which plaintiff urges is conceptually sound or practically feasible . . .

It is . . . difficult to discern a principled basis for distinguishing "customer" from "third parties." Any party that suffers a loss because of a failure of phone service is to some extent a customer of the phone company in the sense that it is receiving a (potential) benefit from its services . . . .

In short, the Court can find no basis for creating an exception to the settled doctrine of limited liability. The obvious policy choice to shield C&P from damage claims in exchange for the benefit of lower rates further suggests that the tariff should be applied to all parties—not just those who contracted for the services in question.

The Court will thus dismiss defendant C&P Telephone Company.

Whether there is a third party exception to the protection afforded telephone utilities by the tariff provisions may be one of first impression in Virginia. Nonetheless, the Virginia Supreme Court has offered analogous guidance.

In *Sydnor & Hundley v. Wilson Trucking*, 213 Va. 704, 194 S.E.2d 733 (1973), the plaintiff, a furniture merchant in Richmond, ordered furniture from Johnson-Carper, a manufacturer in Roanoke. On January 7, 1970, Johnson-Carper sent the furniture by Wilson Trucking, a common carrier, f.o.b. Roanoke. Approximately 60 days later, Johnson-Carper wrote Sydnor requesting payment for the furniture. Wilson claimed the furniture had been delivered to Sydnor's warehouse in Richmond. Sydnor claimed it never received it. Sydnor paid Johnson-Carper and filed suit against Wilson.

The bill of lading for shipment incorporated by reference the conditions of the "tariff which governs this shipment" and made the same applicable "to each party at any time interested in the property shipped." The tariff referred to had been approved and promulgated by the State Corporation Commission and stated that:

> As a condition precedent to recovery, claims must be filed in writing with the . . . carrier . . . in case of failure to make delivery . . . within nine months after a reasonable time for delivery has elapsed; . . . where claims are not filed . . . in accordance with the foregoing provisions, no carrier hereunder shall be liable . . . .

Sydnor failed to comply with the notice provisions of the tariff. The court stated:

> Moreover, Sydnor, for whose benefit and at whose risk the cargo was being transported after it was loaded by the seller f.o.b. Roanoke, was a *third party beneficiary* to the contract a carriage, entitled to sue on the contract, bound by the terms of the contract, and subject to defenses arising out of the contract. Code § 55–22 . . . . (Emphasis supplied.)
>
> We must now decide whether the nine-month notice requirement was a part of the terms of the contract . . . .
>
> Here, the nine-month notice requirement was included in the form bill of lading filed by Wilson with its tariff schedules . . . .

[E]ven if the bill of lading were never delivered to Sydnor, the bill of lading form containing the nine-month notice requirement, when published with tariff schedules filed with the State Corporation Commission, became a part of the contract of carriage in intrastate commerce, even as it does in interstate commerce when published with tariff schedules filed with the Interstate Commerce Commission . . . .

The nine-month notice period expired in October. Sydnor's December written notice was filed too late. The judgment (in favor of Wilson) is affirmed. 213 Va. at 707–709.

*See also, C. & P. Tel. Co. v. Purnell*, 8 Va. Cir. 487 (1969).

In light of the foregoing, this court concludes that the provisions of a tariff approved by the State Corporation Commission have the effect, force and stature of law, define beyond intervention by a circuit court the relationship between a regulated utility and all those who make use of the services furnished by that utility, and accordingly are not limited in scope to those in contractual privity with the utility. Having reached this conclusion, this court sustains the demurrers filed by both utilities and dismisses with prejudice the Plaintiffs' claims, whether they sound in tort or contract, as being barred by the provisions of the utilities' tariffs.